17 A.3d 187

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. W.B., DEFENDANT–APPELLANT.

Argued October 13, 2010—Decided April 27, 2011.

Albin, J., dissented and filed opinion in which Long, and Hoens, JJ., joined.

*Steven J. Kaflowitz* argued the cause for appellant (*Timothy R. Smith & Associates,* attorneys).

*Steven E. Braun,* Chief Assistant Prosecutor, argued the cause for respondent (*Camelia M. Valdes,* Passaic County Prosecutor, attorney).

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Alison S. Perrone* submitted a brief on behalf of *amicus curiae* Association of Criminal Defense Lawyer of New Jersey.

Judge STERN (temporarily assigned) delivered the opinion of the Court.

Defendant was convicted of offenses arising out of the sexual abuse of his then-fourteen-year-old step-daughter. After the Appellate Division affirmed defendant's convictions in an unpublished opinion, we granted certification to review a number of the contentions raised by defendant.

While we now affirm the Appellate Division and sustain defendant's convictions, we hold that Child Sexual Abuse Accommodation Syndrome (CSAAS) expert testimony cannot include any reference to the credibility of sexual abuse victims, and that an adverse inference charge may be given when a police officer destroys his or her investigatory notes before trial.

I.

The proofs at trial included (1) the introduction of a prior inconsistent statement of the victim, defendant's step-daughter, D.L.; (2) CSAAS testimony of an expert, Dr. Richard Coco; (3) fresh complaint testimony of D.L.'s boyfriend, J.C.; and (4) defendant's videotaped confession. Because specific facts relevant to each contention are noted with respect to the claims before us, we need only recite the essential proofs introduced at trial, as found by the Appellate Division, with essential additions, to be sufficient to sustain the conviction:

On January 1, 2005, at approximately 4:00 a.m., J.C. spoke with D.L., his then-sixteen-year-old former girlfriend. She told him that she and family members had been out celebrating the new year and then went home to bed. At some point thereafter, her cousin came to her bedroom and raped her. While telling J.C. this, she also told him that defendant, who is her stepfather, had also previously sexually abused her when she was fourteen years old. According to J.C., D.L. was "hysterical" and "crying a lot." J.C. discussed what he was told with his older sister who subsequently called the Division of Youth and Family Services (DYFS).

On January 12, 2005, the Passaic County Prosecutor's Office (PCPO) received a referral from DYFS, which indicated that D.L. was being sexually abused by her stepfather. Detective Donna Gade, the supervisor of the PCPO's Special Victim's Unit, immediately commenced an investigation.

At approximately 9:00 p.m., two DYFS investigators arrived at defendant's home and asked to speak with D.L. G.R., D.L.'s mother and defendant's wife, called D.L. downstairs, and the investigators spoke with D.L. privately in the kitchen for approximately fifteen minutes. The investigators did not give G.R. a reason for the visit, but G.R. assumed it had to do with the incident involving her nephew. The investigators said they would return later that evening, but did not. Instead, at approximately 10:00 p.m. that evening, Det. Gade, Detective Matthew Gallup, and two other detectives went to defendant's home to "try to locate [D.L.] and her mother as well as the suspect if he were home."

G.R. told Det. Gade that defendant was not home. G.R. contacted defendant and he returned home about fifteen minutes later. Det. Gade testified that she met defendant outside of the house and said that she was interested in speaking with him regarding a "family problem[.]" Det. Gade asked defendant if he would accompany the detectives to the prosecutor's office and defendant agreed. G.R. also agreed to go to the prosecutor's office, and D.L. was asked to accompany her. Det. Gade transported G.R. and D.L.; defendant rode with other detectives in another car. They arrived at the prosecutor's office around 11:00 p.m.

At the PCPO, defendant was placed in the polygraph room. D.L. and G.R. were placed in separate rooms because Det. Gade "didn't want anybody talking to each other." Det. Gade interviewed D.L., who said that, on two separate occasions, defendant had penetrated her vagina with his fingers and his penis. D.L. said that, after these incidents, defendant stopped touching her in a sexual manner. According to Det. Gade, D.L. appeared visibly upset and uncomfortable discussing the matter.

Sometime between 12:27 a.m. and 1:40 a.m., D.L.'s statement was typed. D.L. reviewed it and placed her initials on the top and bottom of each page. D.L. then signed and swore to the truthfulness of her statement before Det. Gallup. After D.L. signed her written statement, Det. Gade took defendant to an interview room for questioning. Defendant was not handcuffed and Det. Gade was not armed.

Det. Gade provided *Miranda* [1] warnings to defendant, using the PCPO's *Miranda* rights and waiver form. She read each right to defendant and asked him if he understood what she said. Defendant replied that he understood and placed his initials after each right listed on the form, indicating his understanding of his rights. He also signed the "waiver of rights" portion of the form. Det. Gade and Det. Gallup each signed the form as witnesses at approximately 2:10 a.m.

Det. Gade then interviewed defendant. Defendant answered Det. Gade's preliminary questions; Det. Gade explained that defendant appeared to be "pretty comfortable" and "acted like a gentleman throughout the whole interview." Det. Gade informed defendant that she had learned that he had engaged in inappropriate conduct with D.L. According to Det. Gade, defendant was "very shocked" and denied that anything inappropriate had occurred. Defendant said that he would never do anything to hurt D.L. and she was like his "own child." However, after sitting for a while and thinking, defendant told Det. Gade that "yeah, you know, I do remember a time when I did have sex with her." Elaborating further, defendant stated that he had been drunk, came home, went to D.L.'s room, crawled into D.L.'s bed and had sex with her.

Defendant agreed to provide Det. Gade with a written statement. At approximately 3:42 a.m., Det. Gade left the room and returned with an individual who typed defendant's responses to her questions. Det. Gade also videotaped defendant's statement.

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

In his videotaped and transcribed statement, defendant acknowledged that he had sexual relations with D.L. twice.

Defendant stated that, on both occasions, he placed his fingers and penis in D.L.'s vagina. Det. Gade asked defendant how she had treated him that evening, and he said Det. Gade had treated him "with kindness and care." After defendant's statement was completed, it was printed and given to defendant for review and signing. Defendant placed his initials on the top and bottom of each page, and signed it at the end. As they had in respect of D.L.'s written statement, Det. Gade and Det. Gallup each signed the statement as witnesses. Defendant was formally arrested and charged at about 5:00 a.m.

At trial, D.L. recanted her earlier statement; she testified that the statement she gave to the investigators was false. She said that she was in love with J.C. at the time, and defendant and G.R. did not approve of the relationship. D.L. stated that if she could not be with J.C., she would claim that defendant sexually abused her so that defendant and her mother too could not "be together."

Defendant also testified at the trial. He said that, on January 12, 2005, he left work at around 5:00 or 5:30 p.m. and went to a "social club." Defendant drank two beers and two "shots" of gin. Defendant left the club about thirty to forty-five minutes later, went to his home to get maracas, and returned to the club to play with a band. Defendant said that he drank four more drinks and a "couple of shots" after returning to the club.

According to defendant's trial testimony, he left the club around 10:00 or 10:15 p.m. As he was leaving, he received a phone call from G.R., who said that someone was at their house looking for him. Defendant returned home at approximately 10:15 or 10:30 p.m. A police car was in the driveway. He stated that one of the police officers grabbed him and told him to put his hands against the wall. The officers patted him down and put him into the police vehicle. Defendant asserted that he did not have an opportunity to refuse to get into the car.

Defendant further testified that he was taken to the prosecutor's office, placed in a locked room and told to wait there. Although the door to the room was locked, he was allowed to leave the room with supervision to go to the bathroom. Defendant claimed that he was kept in the room for about two or two-and-a-half hours and then taken to another room. He asserted he still had no idea why he was at the prosecutor's office, and had nothing to eat or drink after he arrived.

He also testified that he was "tired" and "tipsy" but tried to "keep [his] cool[.]" According to defendant, he was taken to another room, and that Dct. Gade entered the room and told him to sign a piece of paper. Defendant believed the paper was the *Miranda* form. Defendant testified that he did not remember if he understood his rights because he had never seen a form like that before.

Defendant additionally testified that Det. Gade told him that D.L. had provided a statement indicating that defendant had sex with her. Defendant denied the allegations, but Det. Gade kept repeating the details "over and over again[.]" He said that Det. Gade told him that he had to tell her what she wanted to hear "because that's the only way we can all go home." Defendant testified that he was "tired" and "just wanted to go home." He stated that he eventually told Det. Gade "what she wanted to hear[.]"

Defendant was convicted of first-degree aggravated assault, *N.J.S.A.* 2C:14–2a(2)(c), second-degree sexual assault, *N.J.S.A.* 2C:14–2c(4), second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a, and fourth-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–2a(2)(c) and 14–3a. After appropriate mergers, defendant was sentenced on the aggravated sexual assault count to ten years' imprisonment, subject to the provisions of the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, and to a consecutive five-year prison sentence on the endangering count. In the aggregate, then, defendant was sentenced to fifteen years' imprisonment subject, on the aggravated sexual assault, to a

period of parole ineligibility of eight-and-one-half years and a mandatory five-year period of parole supervision.

On appeal, the Appellate Division affirmed the convictions over various challenges directed to evidence presented, the prosecutor's summation, the jury instructions, and certain procedural rulings.[2]

We granted defendant's petition for certification, 201 *N.J.* 442, 991 *A.*2d 232 (2010), and affirm the Appellate Division's judgment.

## II.

■ We first examine the admissibility of defendant's statement. He asserts it should have been "suppressed" because he was detained without probable cause and questioned "in the early morning hours until his will was overborne." [3] Essentially defendant claims that his confession was not voluntarily given.

---

[2] The court, however, remanded to the Law Division for resentencing on count three, the endangering conviction, because "the trial court failed to specifically address the *Yarbough* factors in deciding whether to impose a consecutive sentence." *See State v. Yarbough,* 100 *N.J.* 627, 643–44, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986). On remand, the trial court was also directed to address the issue of jail credits due to a discrepancy in the number of days noted on the record at sentencing as compared to the judgment of conviction.

[3] The admission of a defendant's statement against him at a criminal trial should *not* be the subject of a "motion to suppress." *Rule* 3:5–7, titled "Motion to Suppress Evidence and For Return of Property," deals with motions to suppress physical evidence. *See State v. Robinson,* 224 *N.J.Super.* 495, 499, 540 *A.*2d 1313 (App.Div.1988). Rather, the State has the affirmative duty to prove— in New Jersey by proof beyond a reasonable doubt, *see State v. Yough,* 49 *N.J.* 587, 595, 231 *A.*2d 598 (1967); *N.J.R.E.* 104(c)—both that the defendant's statement was voluntary and, if custodial, that the defendant was advised of his rights and knowingly, voluntarily and intelligently waived them. *See, e.g., State v. Nyhammer,* 197 *N.J.* 383, 388, 963 *A.*2d 316 (2009); *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993); *State v. Presha,* 163 *N.J.* 304, 312–15, 748 *A.*2d 1108 (2000); *State v. Hampton,* 61 *N.J.* 250, 263–72, 294 *A.*2d 23 (1972); *State v. Cabrera,* 387 *N.J.Super.* 81, 99–100, 903 *A.*2d 427 (App.Div.2006); Biunno, *Current N.J. Rules of Evidence* (Gann 2011), comments to *N.J.R.E.* 104(c).

As already noted, defendant was taken to PCPO headquarters at approximately 11:00 p.m., but was not given his *Miranda* warnings until 2:10 a.m. His formal statement did not start until 3:42 a.m., ended after 4:00 a.m., and he was arrested at approximately 5:00 a.m. In his videotaped statement defendant acknowledged that he drank two bottles of beer and a shot of gin the day the police came to his house, but voluntarily went to headquarters with Det. Gade. After making the statement, and acknowledging that it was truthful, defendant signed the statement in front of Det. Gallup and Det. Gade as witnesses.[4]

Defendant claims that he was intoxicated, denied food, water and sleep, and forced to remain in a "four by four box" for hours before being taken to another room and interrogated for more than an hour and one-half. Defendant also asserts that he gave an untrue statement and stated what Det. Gade wanted to hear because he was tired and "just wanted to go home."

Before us, defendant first asserts there was no probable cause to "arrest" and take him to PCPO headquarters. We disagree. First, while he points to defense testimony at the hearing on the motion to suppress that officers entered defendant's home without a warrant looking for him, there was no such finding by the trial judge. In any event, defendant was not there and nothing was seized. Had the police sought to arrest defendant in his home, probable cause to obtain a warrant would have been required. *State v. Brown*, 205 N.J. 133, 14 *A.3d* 26 (2011) ("Absent exigent circumstances or consent, the police must obtain a warrant to

---

[4] We have not viewed the videotape as we are not concerned with uncontested facts or a pure question of law warranting a de novo review. *See State v. Alston*, 204 *N.J.* 614, 626 n. 2, 10 *A.3d* 880 (2011); *State v. Elders*, 192 *N.J.* 224, 243, 927 *A.2d* 1250 (2007); *State v. Harris*, 181 *N.J.* 391, 415–21, 859 *A.2d* 364 (2004). As the finding of compliance with *Miranda* and voluntariness turned on factual and credibility determinations, we need only find sufficient credible evidence in the record to sustain the trial judge's findings and conclusions. *Elders, supra,* 192 *N.J.* at 242–44, 927 *A.2d* 1250; *State v. Godfrey,* 131 *N.J.Super.* 168, 174–75, 329 *A.2d* 75 (App.Div.1974), *aff'd o.b.,* 67 *N.J.* 267, 337 *A.2d* 371 (1975).

conduct an arrest inside a home.") (citations omitted) (Op. at 145, 14 *A*.3d 26).

■ The motion judge found that defendant returned home to meet Det. Gade and voluntarily agreed to accompany her to PCPO headquarters with other family members to discuss a family matter. The voluntary act of going to headquarters thus negates the need for probable cause in this case. Furthermore, while at PCPO headquarters, it was entirely appropriate for Det. Gade to keep defendant separated from his family while obtaining information from the victim, her mother, and a DYFS investigator. Such separation does not necessitate probable cause, but was instead an attempt to safeguard D.L. *See State v. Buda*, 195 *N.J.* 278, 949 *A*.2d 761 (2008) (reiterating that safety of children shall be of paramount concern and children in need must immediately be safeguarded from further injury).

■ We also reject defendant's contention that his recorded statement was not admissible. At the *N.J.R.E.* 104 hearing to determine the admissibility of the statement, Det. Gade testified that she had been employed with PCPO for approximately twelve years, with seven years in the Megan's Law Special Victims Unit. She further testified that she "read each right aloud ... verbatim," and did not force or coerce defendant to sign the *Miranda* waiver form. She admitted that she did not tape the pre-statement interview, and left defendant in the interview room by himself for a few hours.[5]

■ With respect to the statement itself, the Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment,[6] guarantees the right against self-

---

[5] At the time of this interview, the requirement of recordation had not taken effect. *See State v. Cook*, 179 *N.J.* 533, 561–62, 847 *A*.2d 530 (2004); *R.* 3:17 (eff. Jan. 1, 2007).

[6] *Malloy v. Hogan*, 378 *U.S.* 1, 8, 84 *S.Ct.* 1489, 1493–94, 12 *L.Ed.*2d 653, 659 (1964).

incrimination, *Nyhammer, supra,* 197 *N.J.* at 399–400, 963 *A.*2d 316; *Presha, supra,* 163 *N.J.* at 312, 748 *A.*2d 1108, and has been codified in the New Jersey Rules of Evidence, *N.J.R.E.* 503, pursuant to *N.J.S.A.* 2A:84A–19. *Nyhammer, supra,* 197 *N.J.* at 399–400, 963 *A.*2d 316; *Cook, supra,* 179 *N.J.* at 549–50, 847 *A.*2d 530. Inherent in every Fifth Amendment analysis is the question of whether the statement was voluntary, and, independently, whether the law enforcement officers taking it complied with *Miranda. Nyhammer, supra,* 197 *N.J.* at 400, 963 *A.*2d 316 (citing *Miranda, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719 (quotation and internal quotation marks omitted)). *See also Mincey v. Arizona,* 437 *U.S.* 385, 98 *S.Ct.* 2408, 57 *L.Ed.*2d 290 (1978); *State v. Knight,* 183 *N.J.* 449, 461–63, 874 *A.*2d 546 (2005) (detailing factors to be considered under "the totality of the circumstances" in determining voluntariness).[7]

■ In his written opinion admitting defendant's statement, the trial judge determined:

> When [defendant] was escorted at around 11:00 p.m. to the PCPO headquarters, he was not under arrest, not restrained and in no manner under duress. He enjoyed pleasant conversation with the officers in the vehicle and was placed in an office upon arrival at headquarters. The office ... is a standard six feet by six feet, windowless room containing a table and chairs. There were no trappings of restraint or police-work such as handcuffs, bars or other weapons. While [defendant] was waiting in the room, he was able to use the restroom, if he so chose, he was able to walk freely within the room and he even read an entire People Magazine. Granted, the [d]efendant had to wait over three hours to be interviewed and he did not eat or drink at all during that time, that length of time does not pose a problem for the [c]ourt. The officers were conducting multiple interviews with the victim, the victim's mother and others to determine what role, if any, the [d]efendant had in the DYFS referral.
>
> The [d]efendant was not questioned in any way until he was moved to an interrogation room with a video camera to record the proceedings. At that point, he was read his *Miranda* rights by ... Gade, which [defendant] subsequently waived, and the interrogation leading to his confession began. This [c]ourt

---

[7] Defendant produced witnesses at trial to testify that he was tired and intoxicated before being taken to headquarters. That evidence was relevant only to the jury's evaluation of the credibility and "reliability" of the statement *See N.J.R.E.* 104(c). *See also State v. Rosales,* 202 *N.J.* 549, 560–63, 998 *A.*2d 459 (2010).

reviewed the videotaped confession and found no improprieties by the officers. There was no coercion, force or threats, made toward the [d]efendant for him to confess.[8]

This court is satisfied that the confession was the product of a knowing, voluntary and intelligent waiver of [d]efendant's *Miranda* rights. As well, the videotape confession shows the entire conversation the officers had with [defendant], and at no time was [he] under duress, threatened with force, forced to confess or coerced to do so. Therefore, this Court denies the [d]efendant's request to suppress the confession.

The Appellate Division likewise rejected defendant's claims that his confession was involuntary, and found sufficient evidence in the record to sustain the trial court's fact finding. The panel determined that the trial judge carefully considered the totality of the circumstances in upholding the admissibility of the recorded statement. *See Nyhammer, supra,* 197 *N.J.* at 408–09, 963 *A.*2d 316 (no abuse of discretion where trial judge's determination was supported by sufficient credible evidence in record). *See also State v. Mann,* 203 *N.J.* 328, 336–37, 2 *A.*3d 379 (2010); *Elders, supra,* 192 *N.J.* at 243, 927 *A.*2d 1250 (2007); [9] *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (discussing scope of review on motions to suppress physical evidence); *State v. Godfrey,* 131 *N.J.Super.* 168, 329 *A.*2d 75 (App.Div.1974), *aff'd o.b.,* 67 *N.J.* 267, 337 *A.*2d 371 (1975) (findings of trial judge will not be disturbed if reasonably reached on sufficient credible evidence in record). The record justifies the Appellate Division holding.

---

[8] Consideration of "the totality of the circumstances surrounding the arrest and interrogation, [should include] such factors as the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved[,] as well as a suspect's previous encounters with the law." *Presha, supra,* 163 *N.J.* at 313, 748 *A.*2d 1108 (internal quotation marks and citation omitted); *see also Nyhammer, supra,* 197 *N.J.* at 402, 963 *A.*2d 316 (reiterating analysis).

[9] The panel noted that it reviewed the videotape of defendant's confession and the videotape supports the trial court's finding that defendant was not threatened or coerced into confessing to the sexual assaults. As noted, *supra,* at 603 n. 4 (Op. at 603, 17 *A.*3d 187), *Elders* held that the review of a videotape of events subject to the trial court's determinations of credibility and fact finding does not affect the appellate scope of review. That issue is not before us in this case.

### III.

We now turn to the most disturbing procedural aspects of the case—one caused by a discovery rule violation and the other by CSAAS expert testimony. As a result of these errors, we must also consider their impact on the fairness of the trial and our conclusion on the appeal. We turn first to the discovery question.

### A.

We need not take much time to state, once more, that law enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports. *See State v. Branch,* 182 *N.J.* 338, 367, n. 10, 865 *A.*2d 673 (2005); *State v. Cook,* 179 *N.J.* 533, 542 n. 3, 847 *A.*2d 530 (2004). *See also State v. P.S.,* 202 *N.J.* 232, 263, 997 *A.*2d 163 (2010) (regarding loss of victim's taped statement); *State v. Delgado,* 188 *N.J.* 48, 902 *A.*2d 888 (2006) (regarding recordation of identification procedures). Here, Det. Gade conceded on cross-examination that, after she wrote her report, she destroyed notes taken at interviews she conducted with both D.L. and defendant. She explained that she was taught by her superiors not to retain the contemporaneous notes.

Before us, the State asserts that defendant has not shown the possibility of an inconsistency between the notes and the officer's report, nor requested a charge on that subject. The Attorney General, as *amicus curiae,* urges that "this Court should refuse to compel police officers to preserve their notes after the information contained in the notes has been transferred to a comprehensive report." The Attorney General contends that: (1) once the notes are embodied in an officer's report they are no longer needed; and (2) an officer at the scene of a crime or involved in a hot pursuit or other emergent circumstances may not have accurately recorded the events observed or statements he or she obtained. Yet the possibility of a misrecording is precisely why the notes must be maintained—a defendant, protected by the Confrontation Clause and our rules of discovery, is entitled to test whether the

contemporaneous recording is accurate or the final report is inaccurate because of some inconsistency with a contemporaneous recordation. It is for the jury to decide the credibility of the contemporaneous or other recordation made while an investigation is on-going prior to preparation of a formal report.

Our criminal discovery rules do not currently require the recordation of all statements of witnesses obtained by law enforcement officers. But they do provide for discovery of all statements whether signed or unsigned, of witnesses as well as police reports which are "in the possession, custody and control of the prosecutor." *See R.* 3:13–3(c)(6), (7) and (8). Therefore, we hold today that the *Rule* encompasses the writings of any police officer under the prosecutor's supervision as the chief law enforcement officer of the county. *See generally, R.* 3:13–3; *State v. Winne,* 12 *N.J.* 152, 96 *A.2d* 63 (1953); *State v. Vitiello,* 377 *N.J.Super.* 452, 873 *A.2d* 591 (App.Div.2005)(county prosecutor as chief law enforcement officer). If a case is referred to the prosecutor following arrest by a police officer as the initial process, or on a complaint by a police officer, *see R.* 3:3–1; *R.* 3:4–1, local law enforcement is part of the prosecutor's office for discovery purposes. *Winne, supra,* 12 *N.J.* at 171, 96 *A.2d* 63. Logically, because an officer's notes may be of aid to the defense, the time has come to join other states that require the imposition of "an appropriate sanction" whenever an officer's written notes are not preserved. *See People v. Wallace,* 76 *N.Y.2d* 953, 955, 563 *N.Y.S.2d* 722, 565 *N.E.2d* 471 (Ct.App. 1990); *People v. Jackson,* 566 *N.Y.S.2d* 662, 663, 171 *A.D.2d* 688 (App.Div.1991).

That said, we defer the implementation of this retention and disclosure requirement for thirty days in order to allow prosecutors sufficient time to educate police officers accordingly. Contemporaneously, we refer the matter to the Criminal Practice Committee for any necessary clarification of the *Rules.* In any event, starting thirty days from today, if notes of a law enforcement officer are lost or destroyed before trial, a defendant, upon request, may be entitled to an adverse inference charge molded,

after conference with counsel, to the facts of the case.[10] Although our holding regarding the discovery obligation is merely a reiteration of existing law, because defendant neither requested an adverse inference charge before the final jury instructions were given, nor raised the issue before filing his motion for new trial, we decline to hold he was entitled to such an instruction in this case.

### B.

■ The use of Child Sexual Abuse Accommodation Syndrome (CSAAS) expert testimony is well settled. In 1993, this Court held that expert testimony in the area of CSAAS was permissible in order to "explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred." *State v. J.Q.*, 130 *N.J.* 554, 579, 617 *A.*2d 1196 (1993). Such testimony is categorized as behavioral-science testimony because it describes behavior commonly observed in sexually-abused children. *Id.* at 566, 617 *A.*2d 1196. The behavioral studies of CSAAS are designed not to provide certain evidence of guilt or innocence, but rather to insure that all agencies, including the clinician, the offender, the family, and the criminal justice system offer "the child a right to parity with adults in the struggle for credibility and advocacy." *Id.* at 571, 617 *A.*2d 1196 (internal citation omitted).

The rationale supporting the use of CSAAS testimony was first presented in a comprehensive manner by Dr. Roland Summit. Roland C. Summit, M.D., *The Child Sexual Abuse Accommodation Syndrome*, 7 *Child Abuse & Neglect* 177 (1983). Dr. Summit undertook a scientific study of child-sexual-abuse victims to remedy the systemic injury to the child that results from disbelief of abuse. *J.Q., supra,* 130 *N.J.* at 567, 617 *A.*2d 1196. The "purpose

---

[10] Every opportunity when contemporaneous notes are lost or destroyed does not necessitate an adverse inference charge. *See State v. P.S., supra* (contemporaneous notes unnecessary where enough evidence is presented to make out-of-court statement trustworthy).

of the study was to improve the health of the child, ensure that children receive adequate treatment for what they had suffered, and guarantee that society's response is not flawed by misperceptions." *Id.* at 568, 617 A.2d 1196. The CSAAS "represents a common denominator of the most frequently observed victim behaviors." *Ibid.* It includes five categories of behavior, each of which contradicts the most common assumptions of adults: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed disclosure; and (5) retraction. *Id.* at 568–70, 617 A.2d 1196. Accordingly, CSAAS provides a "common language" for analysis and a more "recognizable map" to the understanding of sexual abuse. *Id.* at 571, 617 A.2d 1196.

When CSAAS evidence is presented to a jury, the court must ensure that it is used in accordance with its scientific underpinnings, "i.e. the evidence [i]s not offered to explain the conflicting behavioral traits in this case either of accommodation or delayed disclosure." *Id.* at 574, 617 A.2d 1196. Accordingly, the evidence cannot be presented to the jury to prove directly and substantially that sexual abuse occurred. *Ibid.* Dr. Summit did not intend the accommodation syndrome as a diagnostic device—it does not detect sexual abuse. *Id.* at 579, 617 A.2d 1196. Instead, it assumes the presence of sexual abuse, and explains a child's often counter-intuitive reactions to it. *Id.* at 579, 617 A.2d 1196. CSAAS has a limited, therapeutic purpose, not a predictive one, so "the evidence must be tailored to the purpose for which it is being received." *Id.* at 568, 617 A.2d 1196 (internal citation omitted).

In *State v. P.H.*, 178 N.J. 378, 840 A.2d 808 (2004), the Court summarized the purpose of CSAAS expert testimony:

CSAAS expert testimony may serve a "useful forensic function" when used in a rehabilitative manner to explain why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse. . . . That is, it helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help. . . . CSAAS expert testimony should be admissible to assist a jury in evaluating evidence about an alleged victim's post-assault conduct or behaviors when that conduct may be misperceived by jurors as inconsistent with the truthfulness of the claim of assault. Such testimony properly

can be used to explain why a victim's reactions, as demonstrated by the evidence, are not inconsistent with having been molested.

[178 *N.J.* at 395 (citation omitted).]

Simply stated, CSAAS cannot be used as probative testimony of the existence of sexual abuse in a particular case. *State v. Michaels*, 264 *N.J.Super.* 579, 598–99, 625 *A.*2d 489 (App.Div. 1993), *aff'd*, 136 *N.J.* 299, 642 *A.*2d 1372 (1994). Therefore, introduction of such testimony will be upheld so long as the expert does not attempt to "connect the dots" between the particular child's behavior and the syndrome, or opine whether the particular child was abused. *State v. R.B.*, 183 *N.J.* 308, 328, 873 *A.*2d 511 (2005).

In the present matter, Dr. Coco, a psychologist at the Audrey Hepburn Children's House, testified as an expert witness about CSAAS. Dr. Coco explained to the jury that CSAAS was developed by Dr. Summit to describe behaviors of child sexual abuse victims. He noted that Dr. Summit's purpose was to educate lay people who would otherwise not understand the typical behaviors of such child victims. Dr. Coco outlined these typical characteristics as: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed or unconvincing disclosure; and (5) retraction or recantation. After discussing each characteristic, Dr. Coco noted that CSAAS is "not a diagnosis," and cannot be used as "a tool to decide whether or not sexual abuse had happened." He clarified that "all [the CSAAS] is telling you is that these are very common responses that children have to child sexual abuse[.]" Dr. Coco emphasized that he knew nothing about D.L. or this particular case, and that his testimony did not "relate . . . to this case in any way." He stressed that the purpose of his testimony was "to inform solely about the—the accommodation—the child sexual abuse accommodation syndrome and that's all."

On cross-examination, Dr. Coco reiterated that he had not, at any point, interviewed the alleged victim pertaining to this case nor reviewed any of her alleged statements. He repeated that he had "no opinion" as to whether CSAAS applied to D.L. Dr. Coco reiterated that CSAAS is not a diagnostic tool and cannot be used

to determine "whether or not the alleged victim in this particular case is telling the truth." He did, however, "concede ... that there are people, even children, who do falsely report sexual abuse," but added that "the great majority of them do not." Focusing on this statement, Dr. Coco was examined about whether certain age brackets are more likely to falsely allege sexual abuse. He responded that it was "probably more [likely] in the younger age," but that he could not recall Dr. Summit's research precisely.

On re-direct examination, Dr. Coco again noted that children infrequently lie about child sexual abuse. When asked to "estimate for us in your clinical experience how many children have lied in your experience about it[,]" defendant objected, claiming that Dr. Coco was not to discuss his clinical experience and challenging how he knew whether kids lied. The trial judge overruled that objection, noting that defendant had "opened the door" by trying:

> to turn this guy around as your expert, which is fine, that's legitimate, but now you can't stop him from coming back and getting into the facts. You asked him so many questions and so many questions about the accommodation syndrome, you tried to use him as your expert, that's fine. I don't blame you for that, but he gets a right to come back and rebut that. I think the door's open, I'm going to permit the question.

Dr. Coco again was asked, in his "clinical experience," how often he has observed children lie about sexual abuse. He replied:

> You know, yeah, the research is pretty clear that the great majority of children do not lie about. Of course the research is going to differ in what the actual percentage is of that. So you know, you might be anywhere from five percent of children are found to lie to 10 percent, but it's hard to get a real number on that. But the great majority of children do not lie about the sexual abuse. And in many ways they actually under report what actually happens to them, in terms of the details of the actual abuse incident.

On re-cross, Dr. Coco reiterated that the great majority of children do not lie about sexual abuse. The following colloquy ensued: [11]

---

[11] We detail the colloquy on this subject because it is significant to the question of harmless error.

**Q:** What about 16 year olds? You said it's not across the board, that as you got down the age scale that it's more likely that the kids are telling the truth when they report being sexually abused. Do you [have] any statistical analysis either from Dr. Summit or your own—your own clinical analysis as to what the percentage of times is for a 16 year old?

**A:** The research is not, you know going—there's nothing that's going to be able to give you a clear number on that, but again, an adolescent has more ability to do things with information than a younger child does so that they would be more capable of fabricating something than a younger child would.

**Q:** So the statistics that you provided, five percent, very low level, don't necessarily apply to a 16 year old who discloses something?

**A:** I can't say it does.

. . .

**Q:** Sometimes in fact there's false allegations in that type of hypothetical and you have no type of statistical breakdown that you could give us right now as to that hypothetical, right?

**A:** You're asking for a specific number, I can't give you that, but I can stick to the fact that the great majority of children, throughout the age groups, do not lie about child sexual abuse.

. . .

**Q:** Do statistics bear that out then, you just talked about a dynamic in kids. Do the statistics bear that out? Do the statistics that you just talked about, do they bear out that a greater percentage of the kids in the low age of range of childhood tell the truth versus kids at the upper range of childhood? Do the statistics bear out the dynamic that you just talked about?

**A:** The statistics show that over the range ages, the great majority of children do not lie about sexual abuse. That there are many things that intervene with adolescents that can effect their, you know, their stories or their disclosures. But like I said before, the dynamics of hostility and what have you are not something that we relate to children lying about sexual abuse. Adolescents have more ability to fabricate stories, but that doesn't necessarily mean that they do it more frequently in regards to sexual abuse.

 Dr. Coco's testimony included an assertion that only 5–10% of children exhibiting CSAAS symptoms lie about sexual abuse. Such testimony creates an inference that D.L. told the truth in her original accusation, despite her motives to fabricate the allegations, and notwithstanding her trial testimony recanting them. Certainly, that is not the purpose of CSAAS testimony or the reason for its admission. Even Dr. Coco so acknowledged. Accordingly, we hold that expert testimony about the statistical credibility of victim-witnesses is inadmissible. Statistical information quantifying the number or percentage of abuse victims who

lie deprives the jury of its right and duty to decide the question of credibility of the victim based on evidence relating to the particular victim and the particular facts of the case. Any CSAAS expert testimony beyond its permissible, limited scope cannot be tolerated.

## C.

■ The impact of Dr. Coco's testimony in this case, however, presents a different question. Convictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result. That is often the true issue in many appeals.[12] This appeal is no different.

■ In order for Dr. Coco's testimony to not unduly prejudice defendant, it had to be clear to the jury that he did not interview or evaluate D.L. and that he was not commenting on her credibility or testimony. So viewed, we conclude that the totality of the circumstances neither deprived defendant of a fair trial nor compels reversal. First, Dr. Coco repeatedly clarified that the purpose of his testimony was to advise the jury about characteristics child abuse victims may exhibit. Second, it was clear that D.L. was almost an adult and, therefore, at the age of intellect and experience at which more alleged abuse victims may lie. Third, it was defense counsel, on cross-examination, who first addressed the issue of falsification by children at different age levels.

---

[12] The appropriate test for determining whether the error was unduly prejudicial or harmless may turn on the existence of a constitutional violation. *See Chapman v. California*, 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.2d* 705, 710 (1967), *overruled on other grounds by Brecht v. Abrahamson*, 507 *U.S.* 619, 113 *S.Ct.* 1710, 123 *L.Ed.2d* 353 (1993) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"); *State v. Daniels*, 182 *N.J.* 80, 861 *A.2d* 808 (2004); *State v. Macon*, 57 *N.J.* 325, 335, 273 *A.2d* 1 (1971) ("No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict").

Fourth, the State did not refer in summation to the portion of Dr. Coco's testimony concerning the percentage of young women who lie. And finally, the trial judge instructed the jury not to consider Dr. Coco's testimony "as offering proof that child sexual abuse occurred in this case," or "whether abuse occurred or did not occur," or to "consider that testimony as proving in and of itself that [DL], the alleged victim here, was or was not truthful." More to the point, after a detailed and exhaustive jury charge concerning the proper use of CSAAS testimony, the judge concluded that charge by underscoring that the jury "may not consider the expert testimony as in any way proving that [W.B.] committed an act or did commit any particular act of—of abuse. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse."

Thus, the totality of the circumstances did not deprive defendant of a fair trial, and reversal is not warranted. This result also flows from the other evidence in the case. At trial, D.L. recanted her statement to Det. Gade and explained it was a "disaster" for her family when defendant was arrested. Defendant did not contest the ruling permitting the admission of D.L.'s statement on his appeal before the Appellate Division, nor did he raise it as an issue in the petition for certification. Accordingly, that determination is not before us for review. In this regard, we simply note, however, that the judge conducted a *Gross* [13] hearing at which Det. Gade testified and the record clearly supports the trial judge's determinations concerning admission of D.L.'s statement and the fresh complaint testimony. *See also State v. Burns,* 192 *N.J.* 312, 337, 929 *A.*2d 1041 (2007). Moreover, the aggregate of D.L.'s prior statement, admitted as a prior inconsistent statement under *N.J.R.E.* 803(a)(1), after the *Gross* hearing, J.C.'s testimony about the allegations in the victim's call to him, and defendant's own statement provided the jury more than sufficient evidence on which to sustain the convictions.

---

[13] *State v. Gross,* 121 *N.J.* 1, 577 *A.*2d 806 (1990).

## IV.

 Defendant next asserts that the trial judge improperly admitted, as "fresh complaint" testimony, evidence that, on January 1, 2005—more than one and one-half years after defendant's last assault—D.L. told her former boyfriend J.C. that defendant had sexually assaulted her. "[T]o qualify as fresh complaint, the victim's statements to someone [he or] she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." *State v. Hill*, 121 *N.J.* 150, 163, 578 *A.*2d 370 (1990) (internal citation omitted).[14] Whether these criteria for admissibility are satisfied is committed to the sound discretion of the trial judge. *State v. Bethune*, 121 *N.J.* 137, 147–48, 578 *A.*2d 364 (1990).

 As *P.H., supra*, makes clear, the fresh complaint rule was developed to counteract the persistent "timing myth" that victims of sexual assault would cry out and alert others to the crime. 178 *N.J.* at 392, 840 *A.*2d 808 (explaining that "hue and cry" myth dates back to thirteenth-century notions of feminine behavior). The rule allows the State to neutralize this myth by introducing evidence that the victim did indeed make a complaint within a reasonable time after the alleged assault. *See ibid.* (citing *Hill, supra*, 121 *N.J.* at 163, 578 *A.*2d 370).

 Fresh complaint evidence has a narrow purpose: it is admissible "to prove only that the alleged victim complained [at a

---

14 Admissible under the common law, this type of fresh complaint evidence does not qualify for admission under *N.J.R.E.* 803(c)(2) as an excited utterance because it was not made under stress of excitement and before an opportunity to deliberate; however, fresh complaint evidence may also qualify as excited utterance if 1) related to a "startling event;" 2) made under the stress of excitement caused by the event; and 3) "without opportunity to deliberate or fabricate." *See N.J.R.E.* 803(c)(2). *See also Branch, supra*, 182 *N.J.* at 354–58, 865 *A.*2d 673 (emphasizing requirement that statement be made "without opportunity to deliberate or fabricate" to qualify as excited utterance under *N.J.R.E.* 803(c)(2)).

particular time], not to corroborate the victim's allegations concerning the crime." *State v. R.E.B.*, 385 *N.J.Super.* 72, 89, 895 *A.*2d 1224 (App.Div.2006) (quoting *Bethune, supra,* 121 *N.J.* at 146, 578 *A.*2d 364). A witness may testify only to the general nature of the complaint, and unnecessary details of what happened should not be repeated. *Hill, supra,* 121 *N.J.* at 163, 578 *A.*2d 370; *see also State v. J.S.,* 222 *N.J.Super.* 247, 257, 536 *A.*2d 769 (App.Div.), *certif. denied,* 111 *N.J.* 588, 546 *A.*2d 513 (1988).

■ The record is clear that D.L. made a spontaneous complaint to J.C., a person in whom she would be expected to confide. The spontaneity prong merely requires that the complaint not be the result of coercive interrogation. *See Bethune, supra,* 121 *N.J.* at 145, 578 *A.*2d 364 (children's statements made directly in response to "coercive questioning" not admissible); *Hill, supra,* 121 *N.J.* at 167, 578 *A.*2d 370 (statement not excluded where elicited by "general noncoercive questioning"); *State v. D.R.H.,* 127 *N.J.* 249, 264–265, 604 *A.*2d 89 (1992)(statements made as a result of "pointed, inquisitive, coercive interrogation" not admissible). D.L.'s complaint to J.C. far exceeds the spontaneity requirement. D.L. told J.C. by telephone about the past attacks by defendant almost immediately after she was sexually assaulted by her step-cousin following a New Year's Eve party. Thus, D.L.'s disclosure, an excited reaction incident to a similar traumatic event, was understandable and "invest[ed] ... with spontaneity and plausibility." *Commonwealth v. Smith,* 59 *Mass.App.Ct.* 181, 794 *N.E.*2d 1241, 1244 (2003) (internal citation omitted). In this context the statement to J.C. about defendant's conduct as part of the contemporaneous and excited report concerning her cousin takes on an enhanced indicia of reliability.[15]

■ The admissibility of the fresh complaint evidence also turns on whether D.L.'s complaint was made in a "reasonable time" after the last assault. The Appellate Division concluded

---

[15] No issue is raised under the excited utterance exception to the hearsay rule, and we do not address it. *See N.J.R.E.* 803(c)(2).

that the trial court did not abuse its discretion in determining that D.L. reported the assaults to J.C. "within a reasonable time" and in permitting J.C.'s testimony concerning the content D.L. reported to him. We agree.

It is well settled that the requirement of reporting a sexual assault within a reasonable time must be "applied more flexibly in cases involving children than in [cases] involving adults." *State v. L.P.*, 352 *N.J.Super.* 369, 382, 800 *A.2d* 207 (App.Div.), *certif. denied*, 174 *N.J.* 546, 810 *A.2d* 65 (2002). In deference to children's "special vulnerability to being cajoled and coerced into remaining silent by their abusers, courts allow children additional time to make a fresh complaint." *Bethune, supra*, 121 *N.J.* at 143, 578 *A.2d* 364. Stated differently, the reasonable time component of the fresh complaint rule must be applied flexibly "in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them." *P.H., supra*, 178 *N.J.* at 393, 840 *A.2d* 808.

The more lenient approach to defining what constitutes a "reasonable time" for child complainants is also consistent with the theory of CSAAS, which lists delayed reporting and secrecy among the behaviors common to sexually abused children. Thus, allowing a victim's initial complaints, "even if made a significant time after the abuse, is especially appropriate in a case where the State relies upon CSAAS evidence" to explain those behaviors commonly exhibited by sexually abused children. *L.P., supra*, 352 *N.J.Super.* at 383–84, 800 *A.2d* 207 (explaining that child sexual assault victims commonly exhibit specific behavioral traits including secrecy, helplessness, accommodation, and delayed disclosure).

D.L. was fourteen years old when the attacks by defendant occurred, and sixteen when she confided in J.C. She told J.C. she had previously told no one else because she was "scared." D.L.'s status as a teenager at the time of disclosure, her "open rebellion" against her mother and defendant because they disliked J.C., and the lapse of time between the attacks and disclosure are relevant factors in determining the "reasonableness" of the interval before

disclosure. However, D.L., as defendant's stepdaughter, appears to have lived with defendant at least some of the time during that interval and also indicated to J.C. that she was afraid to report the abuse. Both are factors that impact the determination of "reasonableness." *Cf. L.P., supra,* 352 *N.J.Super.* at 383–85, 800 *A.2d* 207 (allowing fresh complaint evidence where nearly a year had passed since last alleged assault after describing "aura of intimidation," which included living with defendant in foster care setting and continued contact with defendant's natural daughter); *Smith, supra,* 794 *N.E.*2d at 1244 (fifty-one month delay not reasonable because victim had moved out of house); *Commonwealth v. Hyatt,* 31 *Mass.App.Ct.* 488, 579 *N.E.*2d 1365, 1367–68 (1991) (two-year delay reasonable where first disclosure was to boyfriend when he tried to kiss victim and she had been fearful of disrupting home where she and defendant continued to live). Accordingly, we conclude that the interval between the assault and the complaint was reasonable for purposes of admitting the fresh complaint testimony.

## V.

Defendant further claims that his convictions must, in any event, be reversed because the jury charge amounted to an instruction to convict and usurped the jury's responsibility to assess credibility. In gauging this claim, we are mindful that the trial judge used the model charge as amended by this Court in *P.H., supra,* 178 *N.J.* at 399–400, 840 *A.2d* 808.

*P.H.* considered, in detail, the admissibility of both fresh complaint and CSAAS testimony, as well as the relevant jury charges. Both doctrines deal with problems stemming from an abuse victim's failure to report an event, delayed reporting, and popular misconceptions for so doing. *Id.* at 389–401, 840 *A.2d* 808. In *P.H.,* the victim was the defendant's daughter and the sexual abuse occurred during seven visits with her father from 1984 through 1990. *Id.* at 383–84, 840 *A.2d* 808. Although she disclosed certain instances of inappropriate sexual behavior, she did

not report the sexual assaults until 1996. *Id.* at 384–85, 840 *A.*2d 808.

The trial court instructed the jury on both the Model Jury Charge on Fresh Complaint (concerning a victim's failure to report or delayed reporting) and CSAAS (concerning use of the expert testimony on that subject) after presentation of CSAAS expert testimony by both the State and defense. *Id.* at 387–88, 396–399, 840 *A.*2d 808. *Id.* at 388, 840 *A.*2d 808. On appeal, the Appellate Division reversed and remanded for a new trial, determining "that defendant's due process and confrontation rights were violated by instructions that precluded the jury from considering the belated nature of [the victim]'s disclosure in the context of assessing her overall credibility." *Ibid.*

After granting certification, we concluded that instructing on both fresh complaint and CSAAS "clearly had the capacity to confuse the jury" as to its role in assessing the victim's credibility. *Id.* at 399, 840 *A.*2d 808. We explained that, to the extent our jurisprudence on "fresh complaint" instructions and, particularly, *Bethune, supra,* 121 *N.J.* at 144–49, 578 *A.*2d 364,

> may be read to render victim silence or delay in reporting irrelevant to a jury's overall assessment of credibility, the case before us provides a vehicle for clarification. In performing its exceedingly important task of assessing credibility, the jury should be permitted to consider all relevant testimony. Viewed in the context of all the facts surrounding the claimed abuse, the timing of the report of abuse, or silence about it, can be relevant for the jury to consider in the totality of the circumstances. So long as the jury is instructed that such silence or delay, in and of itself, is not inconsistent with a claim of abuse, the proper balance is struck. [*P.H., supra,* 178 *N.J.* at 397, 840 *A.*2d 808.]

We emphasized, however, that CSAAS testimony may explain "why a child victim may remain silent" and "not have made a fresh complaint." *Ibid.* It may also explain the behaviors and conduct of a child victim, "such as the child's affection towards the abuser" [and] "recantation of the complaint . . . ." "that can cast doubt or otherwise affect the evaluation of the child's testimony," and is admissible for that purpose. *Id.* at 397–98, 840 *A.*2d 808. *See also J.Q., supra,* 130 *N.J.* at 579–81, 617 *A.*2d 1196. As a result, we instructed the trial court, on remand, to use the *Model Jury*

*Charge (Criminal)* for Child Sexual Abuse Accommodation Syndrome (2001), if the trial judge found proof of delayed disclosure and CSAAS testimony was admitted in response, rather than using both the Fresh Complaint and CSAAS Model Jury Charges. *P.H., supra*, 178 *N.J.* at 399, 840 *A*.2d 808.

To maintain the necessary and proper balance, we also directed inclusion of the following language at the beginning of the charge:

> The law recognizes the stereotypes about sexual assault complainants may lead some of you to question [complaining witness's] credibility based solely on the fact that [he or she] did not complain of the alleged abuse sooner. You may not *automatically* conclude that [complaining witness's] testimony is untruthful based only on [his or her] silence/delayed disclosure. Rather, you may consider the silence/delayed disclosure along with all of the other evidence including [complaining witness's] explanation for his/her silence/delayed disclosure when you decide how much weight to afford to [complaining witness's] testimony. You also may consider the expert testimony that explained that silence, is in fact, one of the many ways in which a child may respond to sexual abuse. Accordingly, your deliberations in this regard should be informed by the testimony you heard concerning child abuse accommodation syndrome.
>
> [*Id.* at 400, 840 *A*.2d 808 (emphasis added).]

We explained our reason for so directing:

> By including that statement, or one of similar wording, as a preface to the model CSAAS charge, the instruction will address the concerns expressed in *Bethune* as well as our findings in *J.Q.* In situations in which a defendant presents relevant evidence of a child victim's delay in reporting alleged abuse, and the State does not present evidence of CSAAS, the appropriate instruction if requested by the State, would be one similar to the statement outlined above absent the last two sentences. We refer this matter to the Model Charge Committee for their consideration and suggestions for refinement.
>
> [*Ibid.*]

With that amendment, the suggestion that jurors could not consider for any purpose the "child victim's delay in reporting alleged abuse" was eliminated. *Ibid.*

We adhere to *P.H.* and find no basis on which to reverse the conviction because the model CSAAS charge, as amended, was given and the "fresh complaint" charge was not. We caution, however, that our suggested preface "or one of similar wording" to the CSAAS charge and referral to the Model Charge Committee did not cast the suggested charge in stone. To the extent a defendant may believe the word "automatically" unduly

limits the jury's right and obligation to evaluate credibility or, as defendant puts it, "constitute[s] a directive to the jury that it must accept the expert's CSAAS testimony and filter its view of the case through that testimony," the word "automatically" is to be substituted by the words "may or may not conclude that . . . ," or words of like effect. We direct the Model Jury Charges (Criminal) Committee to study the issue on an expedited basis and report back to us with any further recommendations. Moreover, as with all charges, we reiterate that a trial judge should conduct a charge conference on the record and consider the parties' position on any issue they or the judge raises before deciding how to charge the jury on a given issue. *See R.* 1:8–7.

## VI.

Defendant next argues that his videotaped confession was played back to the jury during its deliberations, and because the tape itself was not admitted into evidence, the trial judge did not follow the procedures for such playback as detailed in *State v. Burr,* 195 *N.J.* 119, 948 *A.*2d 627 (2008).

In *Burr,* the victim's pretrial, videotaped statement was admitted into evidence, and played back, "over defendant's objection," in open court at the jury's request. *Id.* at 131–32, 948 *A.*2d 627. *Burr* approved the playback, but codified a four-step procedure for the proper use of such playbacks. *Id.* at 135, 948 *A.*2d 627. First, the jury should be asked if a readback of the statement would suffice. *Id.* at 135, 948 *A.*2d 627. "If the jury persists in its request to view the videotape again, then the court must take into consideration fairness to the defendant." *Ibid.* Second, "[t]he court must determine whether the jury must also hear a readback of any direct and cross-examination testimony that the court concludes is necessary to provide the proper context for the video playback." *Ibid.* Third, the trial judge must permit the defendant to demonstrate that "consequential prejudice . . . from the playback could not be ameliorated through other means." *Ibid.* Fourth, the playback "must occur in open court." *Ibid. See also*

*State v. Miller,* 205 *N.J.* 109, 13 *A.*3d 873 (2011) (adopting precautionary measures and guidelines for playbacks of video and digital recordings of trial testimony).

In the context of this appeal, the playback of the videotape did not constitute an abuse of discretion. Here, the playback of the videotape was in open court, and the tape—whether admitted into evidence [16]—was played to the jury as part of the State's case. Moreover, the trial itself was videotaped, and there was no court reporter or transcriber available to read back what was played to the jury. And, defendant's reliance on that statement—as evidenced by his statement in summation that the videotape was "in evidence" and his encouragement of the jury to request a "readback" and listen carefully—looms large in the resolution of this question.[17] Against that factual backdrop, there is no basis to reverse defendant's convictions, even if the videotape was not admitted into evidence, merely because the jury saw the playback of a videotaped statement that already had been played to it as part of the State's case.[18]

---

[16] It appears that the tape was never moved into evidence.

[17] Counsel said in summation:

It happened the way Mr. [B] said it. And if you don't think that those things happen then you're naïve to think that they really don't happen in today's society.

On other things that's very important—if you need a readback on this particular issue do so—you have—what was read—actually it was played, the tape was played for you—as to what Mr. [B] said. You'll never have the benefit of the pre-formal statement taped interrogation because the police decided not to do it, so we'll never have the benefit of that. But that was played in evidence, and if you need a readback of it you can get it. And there's just uncanny similarities—I'm not going to go into them in too much detail—between what [D.L.] had to say in her statement and what [W.B.] ultimately said on tape.

[18] In light of our disposition of this appeal, we need not address defendant's additional contentions on appeal, that is, that he should have been provided access to the victim's records with the Division of Youth and Family Services, that the prosecution's summation included impermissibly emotional pleas, and that the verdict was against the weight of the evidence. Each of those issues is

## VII.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

Today, in straining to affirm a deeply flawed conviction, the majority rationalizes a series of profound trial errors that undermine any confidence in the correctness of the jury's verdict. First, the majority finds harmless the testimony of a State's expert who gave his assessment of the collective credibility of child-abuse victims, calculating that ninety to ninety-five percent tell the truth. The expert had never met D.L., the putative victim, who recanted her statements implicating defendant. Yet, with his statistically based testimony—without the need to be burdened by the evidence in *this* case—the jury was left to ponder whether, if there was a ninety to ninety-five percent probability that the putative victim was telling the truth, then there must be a ninety to ninety-five percent probability of defendant's guilt. The majority validates as harmless an expert's opinion that denied defendant an individualized assessment of his guilt.

Second, the majority has grossly distorted the doctrine of fresh complaint to justify the admission of a hearsay statement incriminating defendant. In this new jurisprudential world, a victim's statement made to her boyfriend more than fifteen months after alleged sexual encounters with defendant is deemed a "fresh" complaint.

Last, despite the violation of our court rules, the majority sees no problem in the court's giving to the jury during its deliberations a videotaped statement of defendant that was *not* placed in evidence.

Because I believe that these errors individually and cumulatively denied defendant a fair trial, I respectfully dissent.

---

subsumed in the issues we have discussed and no additional discussion is needed.

## I.

### *Guilt by Statistics*

The trial in this case was about the individual credibility of both D.L., who on the stand recanted out-of-court statements implicating defendant, and defendant, who protested his innocence and claimed that the police coerced a confession from him through psychological pressures. The jury had to determine whether D.L. was telling the truth, under oath, when she testified or when she spoke to the police. Under our system of justice, we do not permit the jury to assess the credibility of a model victim, a statistical stereotype, and on that basis to infer guilt, no more than we would permit a jury to infer that the defendant on trial must be guilty because most defendants are guilty. Allowing group assessments of credibility to replace individualized assessments of credibility is antithetical to our system of justice. The deleterious impact of the type of testimony presented in this case, which was sanctioned by the trial court, cannot be ignored or wished away.

The State presented Dr. Coco as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). The purpose of Dr. Coco's testimony was to explain, generally, the reasons a child would delay reporting sexual abuse or, once reporting the abuse, recant the accusation. *See State v. J.Q.*, 130 *N.J.* 554, 579, 617 *A.*2d 1196 (1993) (citation omitted). CSAAS testimony is not offered as proof of a defendant's guilt. As Dr. Coco conceded: "[I]t cannot be offered as a tool to decide whether sexual abuse had happened." *See id.* at 578, 617 *A.*2d 1196 ("CSAAS is not relied on in the scientific community to detect abuse."). Yet, Dr. Coco's testimony departed from the strict limitations our law places on CSAAS testimony.

During cross-examination, the defense attorney elicited from Dr. Coco that some children falsely report sexual abuse. Then, under the pretext of counsel's having opened the door, the court permitted the prosecutor on redirect examination to introduce statistical evidence that approximately ninety to ninety-five per-

cent of child-sexual-abuse complainants are truthful. Even if the defense attorney cracked the door open slightly into this impermissible area, the trial judge, whose obligation is to ensure the fairness of the proceedings, should not have kicked the door wide open.

The jury was permitted to convict defendant based on a simple syllogism totally unrelated to the evidence: if ninety to ninety-five percent of sexual-abuse complainants tell the truth, then D.L. by the laws of statistical probability must have been telling the truth when she reported the sexual abuse to the police; and if D.L. was therefore truthful, then defendant must be lying and guilty of the crimes charged. The defense loudly objected; however, no correction was made by the trial court. The jury was never told that it could not draw the obvious damning inferences that flowed from Dr. Coco's use of statistics to bolster D.L.'s initial complaint. The majority concedes that this testimony was improper and did not fall within the realm of CSAAS evidence, but claims that the error was harmless.

Police officers and social-science experts are *not* allowed to vouch for the credibility of witnesses. *See State v. Frisby*, 174 *N.J.* 583, 591–92, 595, 811 *A.*2d 414 (2002) (finding plain error in police officer's testimony that potential suspect in child-abuse case was "more credible" than defendant).[1] In *J.Q.*, we specifically disapproved of a CSAAS expert touting the credibility of an alleged sex-victim whom the expert had interviewed. *J.Q., supra*, 130 *N.J.* at 556, 575, 617 *A.*2d 1196. Opining on the alleged victims' credibility was an error that went to the heart of the very integrity of the proceedings, and therefore was not deemed harmless. *Id.* at 556, 617 *A.*2d 1196. How much worse in this case where the expert—based on mere statistics—placed his authoritative imprimatur on the credibility of D.L.

---

[1] I do not suggest that character evidence that conforms to the Rules of Evidence would be impermissible. *See N.J.R.E.* 608.

The majority does not deny that the expert misused statistics to support the credibility of D.L. in this case. We disagree about the gravity of that error. For me, the presentation of a statistical, truth-telling, stereotypical victim—that presumably encompassed the alleged victim in this case—cannot be harmless.

Appellate courts are not required to put blinders on when assessing whether patently inadmissible evidence has the clear capacity to taint the jury. Here, the State's case hinged on the credibility of witness testimony, not physical, objective evidence. The alleged victim testified under oath that her previous statements implicating defendant were false, and defendant on the stand testified that he was innocent and that the police elicited from him a false confession. Given this less than overwhelming evidence of guilt, it is impossible to say that Dr. Coco's impermissible testimony did not tip the scales of justice unfairly against defendant. *See Frisby, supra,* 174 *N.J.* at 596, 811 *A.*2d 414 (holding that "[a]ny improper influence on the jury that could have tipped the credibility scale" could not be harmless); *R.* 2:10–2 (stating that new trial should not be granted unless error was "clearly capable of producing an unjust result").

Because the error in this case could not be harmless, defendant should be entitled to a new trial.

## II.

### *A Fifteen–Month–Delayed Report Posing as Fresh Complaint*

That the majority sanctions as a "fresh" complaint a report of sexual abuse that occurred fifteen months earlier indicates that the fresh-complaint doctrine has now become completely untethered from its historical underpinnings. The fresh-complaint doctrine is derived from the common-law requirement that a sexual-assault victim utter a "hue and cry" "to dispel any suspicion" of her consensual involvement in the act. *See State v. Hill,* 121 *N.J.* 150, 157, 578 *A.*2d 370 (1990). Under that requirement, it was assumed that "a 'normal' woman would 'naturally' complain after

having been raped." *Id.* at 162, 578 *A.*2d 370. Outmoded views about how "normal" women would react to a sexual assault reflected in the "hue and cry" requirement gave way to the more nuanced, modern version of the fresh-complaint rule.

Under the present fresh-complaint doctrine, a victim's out-of-court report is admissible to support her in-court testimony for the purpose of negating the inference that her silence would be an indication she was *not* sexually assaulted. *Id.* at 163, 578 *A.*2d 370 (citation omitted). To qualify as a fresh complaint, the victim's statement must have been made to someone she ordinarily would have called for support, *"must have been made within a reasonable time after the alleged assault* and must have been spontaneous and voluntary." *Ibid.* (citations omitted) (emphasis added). The fresh-complaint rule serves the narrow purpose of rebutting the negative inference the jury would draw from silence. *Ibid.* (citation omitted). "Only the fact of the complaint" is admissible, not the particulars of the accusation. *Ibid.* (citation omitted).

Reporting a sexual offense within a "reasonable time" is a precondition to the admission of fresh-complaint evidence. The fifteen-month delay now permitted by the majority completely eviscerates the "reasonable time" requirement and will make every complaint—regardless of when it is reported—fresh. While "courts allow children additional time to make a fresh complaint" when they claim sexual abuse, *State v. Bethune,* 121 *N.J.* 137, 143, 578 *A.*2d 364 (1990), there must be some logical end to that period. Here, the "child" was a young adult, age sixteen, when she made her initial complaint. Today's opinion is the first time that the Court has expanded the fresh-complaint doctrine to permit allegations made so long after an alleged assault. *Cf. State v. Smith,* 158 *N.J.* 376, 378–79, 730 *A.*2d 311 (1999) (complaint one day after assault admissible); *State v. Mann,* 132 *N.J.* 410, 415, 426, 625 *A.*2d 1102 (1993) (complaint within one day after assault admissible); *Hill, supra,* 121 *N.J.* at 152, 154, 169, 578 *A.*2d 370 (complaint to friend within six weeks after assault admissible); *Bethune, supra,* 121 *N.J.* at 140–41, 145–46, 578 *A.*2d 364 (permitting

two-week-delayed complaint, but questioning whether statement was voluntary); *State v. Tirone*, 64 *N.J.* 222, 225–26, 314 *A.*2d 601 (1974) (complaint within one day after assault admissible); *State v. Balles*, 47 *N.J.* 331, 334–35, 339, 221 *A.*2d 1 (1966) (complaint within one day after assault admissible).

That some lower courts have allowed much longer periods to report a sexual assault, while still characterizing the complaint as "fresh," is no reason for this Court to allow the doctrine to become so distorted and muddled that any result affirming a conviction can be rationalized. *See ante* at 617-19. Moreover, the "fresh" complaint in this case was not admitted to support the in-court testimony of the alleged victim but to impeach that testimony. We have never held that fresh-complaint testimony can be used for any purpose other than to show that the prior complaint is consistent with the witness's testimony on the stand. *Cf. Smith, supra,* 158 *N.J.* at 378, 730 *A.*2d 311 (stating that fresh complaint was consistent with alleged victim's trial testimony); *Balles, supra,* 47 *N.J.* at 335, 221 *A.*2d 1 (same). An additional irony is that the State introduced the fifteen-month-late report as "fresh" at the very same time that it introduced CSAAS testimony through an expert to explain why the report was so delayed. One must wonder how a complaint can be admissible based on its "freshness" and yet require the extensive testimony of a CSAAS expert to explain why the complaint was not freshly made.

The importance of evidence to the State does not validate its admission. Process is an end in itself. It assures fairness in all proceedings and legitimizes a trial's outcome. The majority's new and improved fresh-complaint doctrine takes the "fresh" out of the doctrine.

### III.

*Playing Back Videotaped "Confession" Not Introduced in Evidence*

Last, I cannot conclude, as the majority does, that the trial court properly exercised its discretion by playing back for the

jury, during its deliberations, defendant's videotaped "confession" that had never been moved into evidence. Indeed, in the circumstances here, the court was not invested with discretion. The plain language of our court rules permits a deliberating jury only to "take into the jury room the exhibits *received in evidence.*" R. 1:8–8(a) (emphasis added). Here, the court allowed the jury to review an exhibit that had not been introduced into evidence. That the video itself had been played previously in open court is irrelevant. If a knife is marked only as an exhibit and observed by the jury during the trial, a request by the jury, during its deliberations, to view the knife would have to be denied because it was not moved into evidence. This is not a flexible rule. It is not applied pragmatically. Every trial attorney and trial judge knows that the jury can only receive items that have been moved into evidence.

*State v. Burr*, 195 *N.J.* 119, 948 *A.2d* 627 (2008), lends no support to the majority's position. In *Burr*, the videotape played back to the jury "was admitted into evidence as an exhibit." *Id.* at 133, 948 *A.2d* 627. In contrast, here the videotape was not admitted into evidence, although the jury did view the tape during trial. This was a videotaped trial. The jury was entitled to a replay of that portion of the trial during which defendant's taped confession was played or to a reading of a transcript of that part of the trial—nothing more.

When a clear and sensible rule is breached with the blessing of this Court, it will be difficult to predict where and how the next incremental breach will occur.

## IV.

Our ultimate charge is to ensure the integrity of the trial process. When that process has been compromised, as it was here, the public can have no confidence in a jury's verdict. The errors in this trial were profound and undermined the fairness of the proceedings. They were not harmless. For these reasons, I respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, RIVERA–SOTO and STERN (temporarily assigned)—4.

*For reversal*—Justices LONG, ALBIN and HOENS—3.