**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5498-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ABRAHAM ROMAN, a/k/a JOSE
RODRIGUEZ, and ABRAHAM TORRES,

    Defendant-Appellant.

_____

Submitted May 2, 2018 — Decided June 12, 2018

Before Judges Fuentes, Koblitz and Suter.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-07-0651.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Izabella M. Wozniak, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    After a jury trial, Defendant Abraham Roman appeals from his

convictions for second-degree reckless manslaughter, N.J.S.A.

2C:11-4(b)(1), and third-degree theft, N.J.S.A. 2C:20-3. The court sentenced defendant to the statutory minimum of five years in prison, with an eighty-five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a concurrent three year term for theft.

On appeal, defendant argues:

POINT I: DEFENDANT'S STATEMENT TO THE POLICE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE POLICE INTERROGATORS INITIALLY WITHHELD THE FACT THAT THE VICTIM HAD DIED AS A RESULT OF THE ASSAULT.

POINT II: THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF SIMPLE ASSAULT UNDER N.J.S.A. 2C:12-1[(a)].

POINT III: THE DEFENDANT'S SENTENCE WAS EXCESSIVE — THE COURT ERRED IN FAILING TO SENTENCE THE DEFENDANT TO ONE DEGREE LOWER.

POINT IV: THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL N.O.V. BASED UPON INSUFFICIENCY OF THE EVIDENCE SHOULD HAVE BEEN GRANTED.

We find no merit to these arguments and affirm.

I.

Defendant's case was severed from that of his co-defendant Juan Cruz, who was charged with aggravated assault. We glean the following facts from the trial testimony. Shortly before midnight on November 21, 2012, the night before Thanksgiving, Detective James Szpond of the Elizabeth Police Department was in an unmarked patrol car in the parking lot of a car wash in Elizabeth when he

heard something bump into his car, and saw two Hispanic males with a bicycle. Both men got on the bicycle, and Szpond followed them in his car.

The men separated, and Szpond stopped defendant, who said he had been in a fight outside a bar. Defendant was holding a cell phone that was not his, and Szpond took it from him. Szpond began calling numbers in the call history of the phone, and eventually made contact with Leslie DeJesus, who said she knew the phone's owner, Victor Vasquez.

DeJesus testified that after she received the call, she visited Vasquez and saw that he was limping and had two kitchen knives by his bed. His face was bruised, swollen, and "purplish." DeJesus brought Vasquez to the police station where he identified his phone. Vasquez refused medical assistance and was not interested in further police investigation of the incident. He stayed at DeJesus's house that night, complaining that his head and body were hurting. He refused medical attention because he did not have insurance.

The following day, Vasquez went to his aunt's house for Thanksgiving dinner. She testified that he looked "very beaten up." "His lips, his face, his eyes, it was all swollen." She encouraged Vasquez to go to the hospital, but he refused.

3

Stephanie Burgos, the mother of Vasquez's son, testified that they had lived together for nine years, but separated approximately a year before Vasquez died. She typically saw Vasquez two or three times a week, but after Thanksgiving, he did not see her or the children due to injuries to his ribs and migraine headaches.

Vasquez's cousin and co-worker testified that after Thanksgiving Vasquez did not go to work because his chest and head hurt. Vasquez was unable to eat, and was losing his balance and falling down. He had injuries to his neck and face. Vasquez refused to see a doctor.

Carlos Luis Martinez, a supervisor at Vasquez's work, testified that on the Monday after Thanksgiving, Vasquez did not go to work because he had a headache. The next day, Vasquez went to work, and Martinez saw scratches on his face, and marks under one eye and on his forehead. Vasquez seemed weak, and said he was dizzy and his neck, back and head hurt. He did not return to work.

Martinez went to Vasquez's residence on Monday, December 3, to check on him. Vasquez "had a real bad headache, his back was hurting real bad and his neck." Martinez told Vasquez to go to the hospital. On December 11, 2012, Vasquez's dead body was found on the floor of his home.

Two days later, detectives interviewed defendant twice. Defendant waived his <u>Miranda</u>[1] rights at the outset of both interviews, which were recorded and played for the jury.

In his first statement, defendant said that at around 11 p.m. on the night before Thanksgiving he was drinking at a bar and was "a little tipsy." He stepped outside and Vasquez, who was Puerto Rican, made disparaging comments to him about Columbians. Defendant punched Vasquez in the face two or three times. Co-defendant Juan Cruz joined in the fight.

After Vasquez left, Cruz said to defendant "come on, let's go get him[,]" and they rode one bike to chase Vasquez. When they caught up, Cruz hit Vasquez twice in the head. Vasquez dropped to the ground, and defendant hit him and said he may have kicked Vasquez. Defendant grabbed Vasquez's cell phone out of his pocket.

More than halfway through the first interview, the detectives told defendant that Vasquez had died. Defendant responded: "That's what I thought." The detectives asked why he thought that, and defendant replied that it was because an experienced detective was involved in the investigation. Defendant added, "I really didn't want to kill the guy." He said, "I never meant to hurt the guy and kill him."

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

The detectives asked defendant to drive around with them to locate Cruz, who they found in a parking lot. After returning to headquarters, defendant gave another recorded statement after again waiving his right to remain silent. He said that he had not been mistreated by the police.

Junaid Shaikh, M.D., the Union County medical examiner, performed an autopsy. Vasquez had contusions on his forehead, abrasions and contusions on his knees, and abrasions on his right hand. The abrasions had started to heal, indicating that Vasquez did not suffer the injuries immediately prior to death. The injury to his forehead "was sustained some time ago."

Vasquez had a subdural hemorrhage on the right side and base of his brain and bruising on the right lobe of his brain. The doctor also saw a fresh hemorrhage, which could have been caused in one of two ways; either a new injury or a "re-bleed." Shaikh believed, to a reasonable degree of medical certainty, that Vasquez suffered a re-bleed of the initial hemorrhage because there was no evidence of another serious injury. The doctor explained that a rebleed was not unusual if the individual did not seek medical attention after the initial injury, and concluded the cause of Vasquez's death was "subdural hemorrhage due to blunt head trauma."

Shaikh also testified that based on "decompositional changes" to the body, he believed that Vasquez had died two or three days

A-5498-15T2

before his body was found. He testified that Vasquez died as a result of injuries sustained approximately fourteen days prior to his death, "plus or minus[] a couple of days."

Defendant did not testify or call any witnesses. Defense counsel had retained an expert to counter Shaikh, but the expert was "not prepared to go to trial," and defendant, in consultation with counsel, chose not to call the expert.

## II.

Defendant contends the court should have suppressed his recorded statements, arguing that his waiver of the right against self-incrimination was invalid because the police did not tell him at the outset of the interview that Vasquez had died. When determining whether a suspect's waiver of the right against self-incrimination is knowing, intelligent, and voluntary, we defer to a trial court's credibility determinations and factual findings as long as they are supported by sufficient credible evidence in the record. State v. W.B., 205 N.J. 588, 603 n.4 (2011); State v. Yohnnson, 204 N.J. 43, 64-65 (2009). That standard applies even when those findings are "based solely on video or documentary evidence . . . ." State v. S.S., 229 N.J. 360, 379 (2017). So long as the trial court "applied the correct legal test and its findings are supported by sufficient credible evidence in the record," we will only reverse its determination if "there was an

abuse of discretion." State v. Nyhammer, 197 N.J. 383, 409 (2009). Legal issues are reviewed de novo. State v. Shaw, 213 N.J. 398, 411 (2012); W.B., 205 N.J. at 603 n.4.

The privilege against self-incrimination is protected by the Fifth Amendment to the Federal Constitution, and has been codified in N.J.S.A. 2A:84A-19, as well as N.J.R.E. 503. Because the privilege is not self-effectuating, "Miranda's prophylactic-procedural safeguards" protect it. State v. Knight, 183 N.J. 449, 461 (2005) (quoting State v. Burris, 145 N.J. 509, 520 (1996)). "[F]or a confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." State v. Presha, 163 N.J. 304, 313 (2000).

The crux of that inquiry is whether the "suspect's confession is the product of free will," which requires courts to "assess the totality of circumstances surrounding the arrest and interrogation . . . ." Ibid. This test requires a court to consider a suspect's previous encounters with the law and "such factors as 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

The circumstances in this case are somewhat similar to those in <u>Nyhammer</u>, 197 N.J. at 383. There, the police asked the defendant if he would meet with them to discuss allegations that his uncle sexually abused his grand-niece, Amanda. <u>Id.</u> at 389-90. The defendant waived his <u>Miranda</u> rights and agreed to a videotaped interview, admitting that he sexually abused Amanda. <u>Ibid.</u> Only after the interview concluded, did the police inform the defendant of Amanda's allegations against him. <u>Id.</u> at 391. He then gave another videotaped statement in which he described the sexual abuse in detail. <u>Id.</u> at 391-92.

The defendant argued that "his confession should be deemed involuntary because, in addition to giving the <u>Miranda</u> warnings, the police must inform a person, at the outset of any questioning, that he is a suspect (if indeed he is a suspect) or read again the <u>Miranda</u> warnings after questioning begins when he becomes a suspect." <u>Id.</u> at 401. The Court rejected the defendant's argument, and found that <u>Nyhammer</u> did not "fall within the limited category of cases in which we have applied a bright-line rule." <u>Id.</u> at 405. The Court applied the totality-of-the-circumstances test, holding that the defendant's confession was properly admitted into evidence because he voluntarily and intelligently waived his rights. <u>Id.</u> at 408-09.

Though the defendant was not aware that he was a suspect, the police were not required to supply him "'with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights' because 'the additional information could affect only the wisdom of a <u>Miranda</u> waiver, not its essentially voluntary and knowing nature.'" <u>Id.</u> at 407 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 576-77 (1987)). In other words, "a valid waiver does not require that an individual be informed of all information useful in making his decision." <u>Ibid.</u> (quoting <u>Spring</u>, 479 U.S. at 576).

The same is true here. Defendant was aware of his rights and chose to waive them. While he was not told that the victim had died, that piece of information was not essential to a voluntary and knowing waiver of his rights. Defendant also said he suspected the victim had died before he was informed of the death. Moreover, defendant continued to cooperate with the detectives even after they told him Vasquez had died, going so far as to drive around Elizabeth with them to locate another suspect. The totality of the circumstances demonstrate that defendant's waiver of his rights was knowing, intelligent, and voluntary.

Defendant was thirty-one years old. He had a high school diploma and could read and write English. He had three prior criminal convictions, and was familiar with his <u>Miranda</u> rights

because he had previously read them and seen them administered on television. Defendant read the warnings aloud and said he understood them before waiving his right to remain silent.

Defendant later volunteered that he had "waived [his] rights" and "spoke freely." He was not detained for a lengthy period of time, the questioning was not repeated or prolonged, nor was physical punishment or mental exhaustion involved. In fact, during the interview defendant said that he was not mistreated, and that "there was no pressure."

Defendant also quotes from the Court's opinion in State v. O'Neill, for the proposition that "police officers conducting a custodial interrogation cannot withhold essential information necessary for the exercise of the privilege." 193 N.J. 148, 179 (2007). In O'Neill, the police interrogated the nineteen-year-old defendant for ninety-five minutes, eliciting statements linking him to a murder. Id. at 154. The police then advised the defendant of his Miranda rights, and interrogated him for an additional five hours, again eliciting self-incriminating statements. Ibid. At trial, the State sought to admit into evidence only the statements made after the police advised the defendant of his Miranda rights. Id. at 154.

When reversing the admission of the statement, the Court explained that the "two-step, 'question-first, warn-later'

11                                                    A-5498-15T2

interrogation is a technique devised to undermine both the efficacy of <u>Miranda</u> and our state law privilege." <u>Id.</u> at 180. The Court, however, refused to adopt a "bright-line rule" prohibiting the practice. <u>Id.</u> at 181. Thus, <u>O'Neill</u> supports the totality-of-the-circumstances test applied by the trial court here. A two-step process was not used here. Based on the totality of these circumstances, defendant's waiver of his right against self-incrimination was properly found to be knowing, intelligent, and voluntary.

## III.

Defendant argues the court erred by failing to instruct the jury on simple assault as a lesser-included offense of aggravated manslaughter. At the charge conference, the parties agreed that the court should instruct the jury on reckless manslaughter as a lesser-included offense of aggravated manslaughter. Defendant sought an instruction on simple assault as an additional lesser-included offense, but objected to the inclusion of an aggravated assault instruction.[2]

The trial court found defendant's position contradictory. It explained that "the elements are exactly the same, except for the

---

[2]    Defense counsel objected because the consequences of an aggravated assault conviction could be "more severe" than a conviction for reckless manslaughter.

bodily injury, plain bodily injury for a simple assault, and significant bodily injury, and serious" bodily injury for aggravated assault. The court also addressed this issue in its written opinion denying defendant's motion for a new trial. The court found "there was no rational basis to charge Simple Assault, a mere beating[,] when the evidence supported a finding that the beating resulted in the victim's death." The court added that "the jury did not have to find that any one of [] defendant's blows caused the victim's death" so long as it found that "he and/or the co-defendant beat the victim causing the victim's death."

Clear and correct jury instructions are essential for a fair trial because they are "a road map to guide the jury, and without an appropriate charge, a jury can take a wrong turn in its deliberations." State v. Nelson, 173 N.J. 417, 446 (2002) (quoting State v. Koskovich, 168 N.J. 448, 507 (2001)). If the "defendant requests a charge on an offense indicated by the proofs, the charge should be given." State v. Sloane, 111 N.J. 293, 299 (1988).

When a trial court denies a defendant's request to instruct the jury on a lesser-included offense, an appellate court must determine "whether the evidence presents a rational basis on which the jury could [1] acquit the defendant of the greater charge and [2] convict the defendant of the lesser." State v. Alexander, ___

N.J. \_\_\_, \_\_\_ (2018) (slip op. at 19) (quoting State v. Cassady, 198 N.J. 165, 178 (2009)).  The Criminal Code directs that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."  N.J.S.A. 2C:1-8(e) (emphasis added).

Defendant argues that there was a rational basis to charge the jury on simple assault because "the jury could have found that the defendant punched the victim, that the defendant intended to cause only bodily injury, and that the causal relationship between the assault and the victim's death had not been proven beyond a reasonable doubt."

A defendant is guilty of aggravated manslaughter if he or she "recklessly causes death under circumstances manifesting extreme indifference to human life."  N.J.S.A. 2C:11-4(a)(1).  The State must prove three elements beyond a reasonable doubt:  that the defendant (1) caused the victim's death; (2) did so recklessly; and (3) did so under circumstances manifesting extreme indifference to human life.  Model Jury Charge (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004). Reckless manslaughter requires the State to prove only the first two elements:  that the defendant (1) caused the victim's death and (2) did so recklessly.  Model Jury Charge (Criminal),

"Reckless Manslaughter (N.J.S.A. 2C:11-4(b)(1))" (rev. Mar. 22, 2004).

The difference between aggravated and reckless manslaughter "is the difference in the degree of the risk that death will result from defendant's conduct." State v. Curtis, 195 N.J. Super. 354, 364 (App. Div. 1984); see also State v. Breakiron, 108 N.J. 591, 605 (1987) (endorsing our decision in Curtis). If the defendant created only "a mere possibility of death," then he is guilty of reckless manslaughter. Ibid.

A defendant is guilty of simple assault if, as relevant here, he "purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1) (emphasis added). The State must prove beyond a reasonable doubt that the defendant (1) caused bodily injury, and (2) acted purposely or knowingly or recklessly. Model Jury Charge (Criminal), "Simple Assault (Bodily Injury) (Lesser Included Offense) (N.J.S.A. 2C:12-1(a)(1))" (rev. May 8, 2006).

The jury acquitted defendant of aggravated manslaughter, and convicted him of reckless manslaughter, indicating it found that his actions created a possibility, as opposed to a probability, of death. See Model Jury Charge (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004) (differentiating between aggravated and reckless manslaughter).

15

Defendant argues that "the jury could have found that defendant did not cause, either directly or as an accomplice, the death of the victim." Causation, in the context of manslaughter, requires the State to prove beyond a reasonable doubt that "but for the defendant's conduct, [the victim] would not have died." Model Jury Charge (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004); see also Model Jury Charge (Criminal), "Reckless Manslaughter (N.J.S.A. 2C:11-4(b)(1))" (rev. Mar. 22, 2004) (stating same). The State also must prove that the victim's death was

> within the risk of which the defendant was aware. If not, it must involve the same kind of injury or harm as the probable result of the defendant's conduct and must also not be too remote, too accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense. In other words, the State must prove beyond a reasonable doubt that [the victim's] death was not so unexpected or unusual that it would be unjust to find the defendant guilty of . . . manslaughter.
>
> [Model Jury Charge (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004).]

see also Model Jury Charge (Criminal), "Reckless Manslaughter (N.J.S.A. 2C:11-4(b)(1))" (rev. Mar. 22, 2004) (stating same). Whether defendant's actions caused Vasquez's death was the

critical issue in dispute, and the jury made its determination as to the cause of death.

While defendant contested that the subdural hemorrhage caused Vasquez's death, he did not contest that he and Cruz caused the subdural hemorrhage when they attacked Vasquez. A subdural hemorrhage constitutes more than "pain, illness, or [physical] impairment," and is therefore more serious than simple "bodily injury" under N.J.S.A. 2C:11-1(a). As confirmed by Shaikh's testimony, a subdural hemorrhage is "impairment . . . of the function of [a] bodily . . . organ," namely the brain, and is "serious bodily injury" under N.J.S.A. 2C:11-1(b).

There was no evidence to support the notion that defendant caused only "bodily injury" to Vasquez and therefore there was no rational basis for the jury to find defendant guilty of simple assault. See State v. Crisantos, 102 N.J. 265, 280 (1986) (stating that there is no rational basis to support a jury charge if it "is substantiated by no testimony in the record").

IV.

Defendant contends that the court should have sentenced him as a third-degree offender, downgrading the reckless manslaughter charge. Prior to sentencing, the State moved for imposition of a discretionary extended term because defendant had three prior felony convictions and was a persistent offender under N.J.S.A.

2C:44-3(a). The State recommended that defendant be sentenced to an aggregate term of fifteen years in prison with an eighty-five percent parole disqualifier. Defendant conceded that he was eligible for a discretionary extended term as a persistent offender, but requested the court sentence him as a third-degree offender to three or four years in prison, subject to NERA.

The court denied the State's motion for an extended term, because defendant was "extremely remorseful," had "been truthful numerous times," and "it wasn't [his] intent to kill Mr. Vazquez."

Defendant argued that the court should find the following mitigating factors: two, that he "did not contemplate that his conduct would cause or threaten serious harm"; three, that he "acted under a strong provocation"; five, that the "victim of [his] conduct induced or facilitated its commission"; nine, that his "character and attitude . . . indicate that he is unlikely to commit another offense"; and twelve, his "willingness . . . to cooperate with law enforcement authorities." See N.J.S.A. 2C:44-1(b). The court found no mitigating factors.

The court found aggravating factors three, the risk that defendant will commit another offense; six, the extent of his prior criminal record and seriousness of the offense; and nine, the need for deterring defendant and others from violating the law. See N.J.S.A. 2C:44-1(a).

Although it found that the aggravating factors outweighed the mitigating factors, the court sentenced defendant to the statutory minimum aggregate sentence: five years in prison subject to NERA. Thus, even if the court had formally found mitigating factor twelve, that defendant cooperated with law enforcement, it could not have legally sentenced defendant to a lesser term. The court in its comments made clear that it sentenced defendant leniently due to defendant's cooperation with law enforcement and his deep remorse.

The court properly rejected defendant's request to be sentenced as a third-degree offender. Under N.J.S.A. 2C:44-1(f)(2), if a defendant is convicted of a first- or second-degree offense, and a sentencing court "is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted." Thus, "for a sentence to be downgraded, a two-step test must be satisfied." State v. Megargel, 143 N.J. 484, 495 (1996). The sentencing court must be "(1) clearly convinced that the mitigating factors substantially outweigh the aggravating factors and (2) the interest of justice must demand the downgrade." Ibid. Neither of those requirements was satisfied in this case.

We cannot reverse a sentence "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3)" it "'shock[s] the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). The trial court followed sentencing guidelines in imposing the most lenient sentence permitted by law.

V.

Finally, defendant argues briefly that the court erred by denying his motion for a judgment of acquittal based on insufficient evidence. The State presented sufficient evidence that defendant recklessly caused the victim's death by assaulting him and stole the victim's cell phone. This argument is without sufficient merit to require further discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION