# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3342-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN KATSIGIANNIS,

    Defendant-Appellant.

_____

        Submitted March 16, 2020 – Decided April 22, 2020

        Before Judges Sabatino and Natali.

        On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 08-06-1066.

        Robert C. Pierce, attorney for appellant.

        Mark Musella, Bergen County Prosecutor, attorney for respondent (Edward F. Ray, Assistant Prosecutor, of counsel and on the brief).

        Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant John Katsigiannis appeals from a March 4, 2019 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

After defendant's first trial ended in a mistrial due to a hung jury, a second jury convicted him of first-degree aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a)(1). The charges arose out of defendant's digital penetration of the fifteen-month-old daughter of his then girlfriend. The court imposed a fifteen-year custodial sentence, with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, along with a mandatory five-year period of parole supervision. We affirmed defendant's conviction but remanded for resentencing, see State v. Katsigiannis, No. A-4685-12 (App. Div. Oct. 1, 2014). At resentencing, the court stated it no longer relied upon aggravating factor one, but otherwise left defendant's sentence unchanged. The Supreme Court denied defendant's petition for certification. State v. Katsigiannis, 221 N.J. 286 (2015).

The facts underlying defendant's convictions are detailed in our previous unpublished opinion. We nevertheless recount many of those facts to provide necessary context for this opinion.

A-3342-18T2

At the time of the assault, K.P. (Kelly)[1] lived with her mother L.R. (Lucy) and maternal grandmother. Lucy had been dating defendant for a short period, and she testified that she and defendant would often bring Kelly along on dates, as she trusted defendant. Defendant occasionally assisted with Kelly's care by changing diapers and babysitting while Lucy was at work.

Throughout the relationship, and because Lucy's mother would not allow defendant to spend nights at their residence, Lucy and Kelly frequently slept at defendant's house in Fair Lawn where defendant lived with his father, sister, uncle, and grandparents. One afternoon, defendant and Lucy invited friends over to defendant's backyard for a barbeque and then a visit to a nearby public pool. During the party, defendant offered to take Kelly inside for a nap. Lucy agreed because she thought defendant "was going to give [her] a little bit of a break to sit down" and she "didn't think there was anything odd about it at the time."

When defendant did not soon return, Lucy testified at the second trial that she and defendant's friend D.C. (David) went into the house to look for him. Lucy stated that she and David went to defendant's bedroom upstairs and found

---

[1] We employ initials and pseudonyms to protect the privacy of the parties. R. 1:38-3(c)(9).

A-3342-18T2

the door closed, so David opened it slightly. In response, according to Lucy, defendant closed the door and told them to go outside because defendant's grandmother was sleeping. Lucy testified that she assumed Kelly was in the room as well. She then stated that when she and David went downstairs, he said "[i]f that was my kid I would make sure she was okay." In response, because she trusted defendant, she told David that Kelly was "upstairs with [defendant], she's okay."

As Lucy began to get ready to go to the pool, she noticed that defendant had changed Kelly into her "swimmie" diapers and bathing suit. At the pool, defendant and Lucy stayed in the shallow end with Kelly. Defendant was holding Kelly in the water when Lucy noticed "that she was uncomfortable and . . . it looked like she was cold . . . ." Lucy asked defendant to give Kelly to her, and while he initially stated "I got her, I got her," he eventually complied. Lucy walked to a bench and quickly changed Kelly into a dry diaper.

Shortly thereafter, all members of the group except for David returned to defendant's house. According to Lucy, defendant left the house a few minutes later "to go see [David] about something regarding a laptop." When defendant returned, his friends left. At this point, Lucy stated she was going to bathe Kelly, but defendant insisted that he do so. Defendant walked her to the bathroom and

closed the door. Lucy testified that shortly thereafter, she opened the bathroom door and saw Kelly without her clothes on and a bloody diaper on the floor.

Lucy grabbed Kelly, brought her back into the bedroom, and noticed an "open tear" on her vagina. Lucy screamed to call an ambulance, but defendant replied "[o]h, that doesn't look like anything. That's okay." In response, Lucy stated that if defendant did not take them to the hospital, she was going to call her mother to do so. Defendant drove Lucy and Kelly to the hospital, and Lucy spoke with emergency personnel regarding Kelly's condition. Defendant testified that at this point, he left to meet with the party guests in order to "find out . . . any details about what had happened to [Kelly]." Defendant returned to the hospital at approximately 3:00 a.m.

Leah Raguindin, M.D., was the first doctor to examine Kelly. Dr. Raguindin determined that Kelly sustained multiple lacerations to her hymenial tissue and referred her to Victor Valda, M.D., for surgery. She also referred Kelly to Julia Debellis, M.D., because of the type of damage and the fact that there was "no explanation for the injury."

Dr. Debellis, a board-certified specialist in child-abuse pediatrics, examined Kelly next. She spoke to defendant and Lucy separately regarding Kelly's injury. Dr. Debellis then performed a physical examination which

5

revealed blood clots and bruising "all over the hymen," as well as lacerations on the hymen.  She believed that the injury occurred within the previous day because the wound was "oozing blood" and concluded that the injury was caused by "[a]cute penetrating trauma."  She also testified that the injury could not have been the result of activities such as "sitting in a baby's swing[,] . . . going down on a slide," or wiping the area.  Dr. Debellis contacted the Division of Youth and Family Services (the Division) and the Bergen County Prosecutor's Office "because the injuries reflected penetrating trauma, and there was no history given about [Kelly] suffering penetrating trauma."

Shortly thereafter, Detective Michael Guzman of the Bergen County Prosecutor's Office and Detectives James Corcoran and Jeff Welsh of the Fair Lawn Police Department (FLPD) arrived at the hospital.  FLPD Officer Sean Macys provided them with written statements he had obtained from defendant and Lucy.  In defendant's written statement, which was admitted at trial, he stated that prior to leaving for the pool, he "took [Kelly] up to [his] room and took her diaper off to put a swimming diaper on," and that night when he and Lucy "took [Kelly's] diaper off[,] [they] noticed it was full of blood."  In Lucy's written statement, which she read into the record on cross-examination at the second trial, she stated that before they left for the pool, defendant changed

Kelly's diaper and she "was in the room." Lucy also wrote that later, as she prepared to bathe Kelly, "when [she] took off [Kelly's] diaper there was blood in it."

After reviewing the statements, the officers confirmed the statements' contents with defendant and Lucy and asked defendant to accompany them to the pool. In his written report memorializing the investigation, Guzman noted that Lucy informed him that before they went to the pool, "with [defendant] present she changed [Kelly]'s diaper into a swimming diaper . . . ." Lucy also stated that later that night, she and defendant "decided to give [Kelly] a bath," and while preparing to do so, "they took off her clothing and diaper and noticed blood in the diaper." Guzman further indicated that defendant "gave the same recollection of the day," but did not record any specific statements he made.

At the pool, defendant led the officers to the garbage can containing the "swimmie" diaper, which they retrieved. Guzman opened the diaper and noticed "some type of pinkish fluid" inside it. The officers next sought to search defendant's home, and defendant signed a form indicating his consent. They traveled to defendant's home, and defendant directed them to his bedroom and the nearby bathroom where Kelly's diapers were thrown in the trash. Guzman retrieved baby wipes from the garbage can in the bedroom that he stated

appeared to have blood on them and obtained a bloody diaper from the garbage can in the bathroom.

Once upstairs, defendant was not permitted to speak with his family members. Officers instructed defendant to remain in the upstairs bedroom, and he was always accompanied by one or more uniformed officers. Defendant's family members were congregated on couches in the family room, with a police officer stationed there. The police declined to allow defendant's father to join him upstairs, and they also did not allow defendant's grandmother to speak to him in Greek.

After returning to the hospital, the officers obtained defendant's consent to search his vehicle. Following that search, Corcoran and Welsh asked defendant to go with them to the FLPD for an interview and recorded statement, and defendant agreed to do so. Corcoran and Welsh brought defendant to "an open common area" in the Detective Bureau and advised him of his Miranda[2] rights. Defendant thereafter went into a nearby interview room and prepared a written statement, which was admitted at trial. In that second written statement, defendant again stated that "[he] took [Kelly] upstairs and changed her to her

_____

[2] Miranda v. Arizona, 374 U.S. 436 (1966).

swim diaper" prior to going to the pool, and prior to bathing her, he and Lucy "took her diaper off . . . and saw she was bleeding."

Guzman arrived at the station and interviewed defendant along with Corcoran and Welsh. At that interview, defendant initially denied injuring Kelly, but later admitted that when he was changing her, his "finger did go in by accident. It wasn't intentional," and "a little bit of blood came off [his] finger." At this point, the officers arrested defendant.

Defendant filed a PCR petition and the court then appointed PCR counsel. In his petition, defendant maintained that his trial counsel was ineffective for failing to: 1) call David and Macys as witnesses; 2) impeach or cross-examine Lucy with a prior inconsistent statement made to a doctor and two law enforcement officers; 3) cross-examine Guzman on his report stating Lucy changed Kelly's diaper; 4) cross-examine Guzman and Corcoran regarding the destruction of their notes and seek an adverse jury instruction; 5) object to Lucy's hearsay testimony regarding David's statement that "[i]f that was my kid I would make sure she was okay" or cross-examine her statement that she had never had prior contact with the Division; and 6) cross-examine Guzman regarding his testimony that David refused to be interviewed. PCR counsel also

argued that the State failed to provide defendant with Guzman's notes of the interview with David, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

Defendant also claimed his former appellate counsel's representation was deficient because he failed to: 1) challenge the State's improper burden-shifting when Guzman testified at trial that none of the other attendees to the barbeque had returned his request to provide statements; and 2) raise the issue that defendant's confession should have been suppressed based on an unlawful seizure.

PCR counsel further argued that the cumulative errors at defendant's second trial and on his first appeal warranted either a reversal of his conviction and a new trial, or at least an evidentiary hearing regarding his ineffective assistance claims and the alleged <u>Brady</u> violation.

Judge Christopher R. Kazlau issued a detailed written opinion in which he rejected defendant's PCR claims that trial counsel was ineffective under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The judge explained that defendant's disagreement with trial counsel's strategy was insufficient to establish a prima facie case of ineffective assistance. Specifically, Judge Kazlau determined that trial counsel's failure to call David as a witness was reasonable based on his assessment that David "was 'f---ed up and looked anxious'" (an

observation defendant recounted in his PCR certification) which "could have been a liability for the defense." Further, the judge concluded that since defendant "initially lied to the police," his case would have been undermined if counsel called Macys as a witness.

Judge Kazlau also explained that, contrary to defendant's assertion, trial counsel did cross-examine Lucy and Guzman, and just because he did so "in a manner not contemplated by [defendant]," that did not render counsel's performance ineffective as it "did not materially prejudice" defendant. Moreover, Judge Kazlau concluded that Lucy's testimony regarding David's statement that he "would make sure [Kelly] was okay" was "offered to show [David]'s state of mind at the time he made the statement," and thus was properly admitted.

Judge Kazlau also concluded that defendant's request for an adverse jury instruction relating to the destruction of the interview notes was procedurally barred under Rule 3:22-5, as it was raised and rejected on his direct appeal. He further determined that no Brady violation occurred because the State did in fact give interview the notes from David's interview to defense counsel on September 16, 2011.

Regarding defendant's claims of ineffective assistance of appellate counsel, Judge Kazlau concluded "the State did not shift the burden on [defendant]'s failure to produce a witness at his second trial." The judge also found that defendant "was not in custody for purposes of custodial interrogation until the detectives brought him to his residence, but the questioning did not trigger the duty to provide <u>Miranda</u> warnings." Hence, no alleged constitutional violation occurred that could have been successfully challenged on appeal. In addition, the judge concluded that there was no cumulative effect of errors by counsel that mandated reversal of defendant's conviction. Finally, the judge determined that defendant was not entitled to an evidentiary hearing.

On appeal, PCR counsel raises substantially the same arguments rejected by the PCR court. Specifically, defendant claims:

> POINT ONE
>
> THE TRIAL COURT ERRED BY NOT ORDERING AN EVIDENTIARY HEARING.
>
>> A. The prevailing legal principles regarding claims of ineffective assistance of counsel, evidentiary hearings and petitions for post-conviction relief.
>>
>> B. Trial counsel was ineffective for failing to call [David] as a defense witness.

12

C. Trial counsel was ineffective for failing to call Officer Sean Macys as a witness.

D. Trial counsel was ineffective for failing to impeach [Lucy] with all of her prior inconsistent statements that [defendant] was in the room during the diaper change and to cross-examine Detective Guzman with his report.

E. Trial counsel failed to cross-examine Detectives Guzman and Corcoran concerning the destruction of their interview notes and, therefore, also failed to request an adverse inference jury instruction.

F. Trial counsel was ineffective for failing to object to [Lucy]'s hearsay testimony that [David] told her, "If that was my kid I would make sure she was okay."

G. Trial counsel failed to cross-examine Detective Guzman concerning his testimony that [David] refused to be interviewed.

H. Trial counsel failed to impeach [Lucy] when she testified that she never had a prior dealing with DYFS.

POINT TWO

THE TRIAL COURT ERRED BY NOT GRANTING [DEFENDANT]'S PETITION FOR POST-CONVICTION RELIEF BECAUSE HE ESTABLISHED THAT HE WAS DEPRIVED

EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

A. Appellate counsel failed to raise the issue that the State improperly shifted the burden of proof by asking Detective Guzman whether any of the names of persons, supplied by [defendant], agreed to give a statement to the police, which Guzman replied in the negative.

B. Appellate counsel failed to raise the issue that [defendant]'s alleged confession must be suppressed due to his unlawful Fourth Amendment seizure.

In his supplemental pro se brief, defendant also argues:

POINT ONE

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CALL [DAVID] AS A WITNESS.

POINT TWO

TRIAL COUNSEL FAILED TO OBJECT, MAKE A MOTION TO STRIKE THE RECORD OR REQUEST A CURATIVE JURY INSTRUCTION CONCERNING [LUCY]'S HEARSAY TESTIMONY THAT [DAVID] TOLD HER, "IF THAT WAS MY KID I WOULD MAKE SURE SHE WAS OKAY," CONSTITUTING INEFFECTIVE ASSISTANCE OF COU[]NSEL IN CONTRAVENTION TO THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, PAR. 10 OF THE NEW JERSEY CONSTITUTION OF 1947.

POINT THREE

14

JOHN KATSIGIANNI[S]' APPELLATE COUNSEL FAILED TO RAISE THE [FOURTH] AMENDMENT SEARCH AND SEIZURE VIOLATION HE WAS SUBJECTED TO CONSTITUTING INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN CONTRAVENTION TO THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, [PAR.] 10 OF THE NEW JERSEY CONSTITUTION OF 1947.

## II.

The PCR process provides a defendant a "last chance to challenge the 'fairness and reliability of a criminal verdict . . . .'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. Feaster, 184 N.J. 235, 249 (2005)). When, as here, no evidentiary hearing is held we "conduct a de novo review of both the factual findings and legal conclusions of the PCR court." State v. Harris, 181 N.J. 391, 421 (2004).

Because defendant's PCR petition is predicated on his claim that trial counsel was ineffective, he must satisfy the two-part test pronounced in Strickland by demonstrating that "counsel's performance was deficient," that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687; see also State v. Fritz, 105 N.J. 42, 58 (1987). The first prong requires a showing

that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

A defendant, however, must overcome a strong presumption that counsel rendered reasonable professional assistance. Id. at 689. "[C]omplaints 'merely of matters of trial strategy'" will not establish a valid ineffective assistance of counsel claim. Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963)); see also Nash, 212 N.J. 518, 543 (2013) ("The test is not whether defense counsel could have done better, but whether he met the constitutional threshold for effectiveness."). It is the defendant's burden to prove, by a preponderance of the evidence, that counsel's decisions about trial strategy were not within the broad spectrum of competent legal representation. Fritz, 105 N.J. at 52.

Under the second prong, a defendant must demonstrate that his counsel's errors prejudiced the defense such as to deprive defendant of a fair and reliable trial outcome. Strickland, 466 U.S. at 687. To prove this element, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

III.

A-3342-18T2

In defendant's first substantive point he contends that his trial counsel was ineffective because he failed "to bring to the jury's attention that [Lucy] . . . was in his small bedroom when [defendant] changed [Kelly]'s diaper," and this evidence "would have provided exculpatory evidence that the injury sustained by [Kelly] during the diaper change was caused by an accident and not a knowing first-degree assault." Defendant maintains such evidence would have been admitted if not for trial counsel's constitutional ineffectiveness in failing to call David and Macys as witnesses, impeach Lucy on her prior inconsistent statements, cross-examine Guzman and Corcoran regarding their notes from their interview with David, and object to a hearsay statement made by Lucy. We disagree.

Defendant further explains that David would have provided "unbiased eyewitness testimony that [Lucy] was in [defendant]'s small bedroom when [Kelly] was changed," and therefore if the jury heard his testimony, defendant would have been acquitted. Defendant contends that Macys, as the first police officer to speak with Lucy and defendant at the hospital, should have been called as a witness because "during the first opportunity for [defendant] to tell the police what had happened, he informed . . . Macys that [Lucy] was in the room

when the diaper was changed" and thus Macys would have corroborated defendant's testimony and undermined Lucy's.

"Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). Defense counsel's decision as to which witnesses he or she will call is "an art," id. at 321 (quoting Strickland, 466 U.S. at 693), and review of such a decision should be "highly deferential." Ibid. (quoting Strickland, 466 U.S. at 689). Counsel has a duty, however, "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.

In an affidavit provided to the PCR court, David stated that he routinely took painkillers and muscle relaxers due to injuries sustained as a result of multiple car accidents. As defendant further certified, on the day David was to be called as a witness, trial counsel informed defendant that David was "f—ked up and looked anxious." Defendant contended this was "just how [David] acts," and trial counsel allegedly told defendant he would call David the next day. The following day, trial counsel ended its case-in-chief with defendant's testimony and advised defendant of his trial strategy that it was most effective to present defendant's testimony last. We agree with the PCR court that trial counsel's

18

assessment of David's demeanor on the first day of the defense's presentation and his strategy to end with defendant on the second day rendered his decision against calling David as a witness objectively reasonable under the circumstances.

Further, as David stated in his affidavit in support of defendant's PCR petition, he "would have given the same testimony as [he] did at [defendant]'s first trial." Notably, at defendant's first trial, David never testified that he observed Lucy in defendant's bedroom at the time defendant changed Kelly, and only stated that he saw defendant, Lucy, and Kelly "coming down" the stairs. While he testified that Lucy "had to have been up[stairs] . . . because she came down," David admitted that he had not "heard her or s[een] her" upstairs. Moreover, David also testified on direct examination at the first trial that when he knocked on defendant's bedroom door, defendant "didn't tell [David] he was changing the diaper." This allowed the State to cross-examine him on a prior inconsistent statement he made to Guzman in which he stated he "knocked on the door and [defendant] said he was changing a diaper." David's testimony, as at the first trial, would have been subject to cross-examination regarding that prior inconsistent statement.

With respect to Macys, it was reasonable for trial counsel not to call him as a witness, as his testimony would have been duplicative. Defendant and Lucy both memorialized their statements to Macys in written form, and both statements were witnessed and signed by Macys. Defendant's written statement was admitted into evidence at the second trial and Lucy read the entirety of her statement to the jury on cross-examination, including the portion in which she stated that prior to going to the pool, she "went upstairs, [defendant] changed [Kelly's] diaper, [and she] was in the room."

Further, as the State correctly argues, Macys would have been unable to testify regarding the truth of many of the hearsay statements in his reports. While police reports in the course of an investigation may be "admissible to prove, for example, that a report of crime was made by a member of the public" under the business record exception to the hearsay rule, "'citizen' declarations are virtually universally held to constitute excluded hearsay in respect of otherwise admissible police reports." State v. Lungsford, 167 N.J. Super. 296, 310 (App. Div. 1979); see also Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 361 (2013) (citing Lungsford in support of a determination that witness statements appended to an otherwise admissible investigative report were nevertheless hearsay). Moreover, there is always some inherent risk in a defense

attorney calling a police officer in a criminal trial as "a witness identified with an adverse party . . . ." See N.J.R.E. 611(c).

The record also supports the PCR court's determination that trial counsel's failure to call Macys did not prejudice defendant. Defendant argues that Macys would have supported Lucy's and defendant's initial written statements that Lucy was in the room while defendant changed Kelly's diaper. Lucy, however, admitted during the State's case-in-chief at the second trial that she lied in that statement to protect defendant. Thus, the jury was painstakingly aware of her earlier statements and the various claims regarding who was present in the room – none of which excluded defendant. Moreover, defendant himself omitted from his written statement that, as he later testified at trial, he "caused the injury but not on purpose."

IV.

Defendant also asserts that he received ineffective assistance of counsel when his attorney failed to impeach Lucy regarding her prior inconsistent statements to Dr. Debellis, Macys, and Guzman that she was in defendant's room while he changed Kelly's diaper, as well as her testimony that she had never been the subject of a Division investigation. Defendant further maintains that trial counsel's failure to cross-examine Guzman regarding the statements in his

21

written report that Lucy stated she changed Kelly's diaper and that defendant "gave the same recollection of the day" amounted to ineffective assistance.

Trial counsel, however, did have Lucy read her entire written statement to the jury and cross-examined her on the portion of that statement in which she stated "I went upstairs[,] [defendant] changed [Kelly's] diaper[,] I was in the room." Further, as noted, Lucy had already admitted on direct examination that this statement was untruthful. Similarly, the jury was already aware that Lucy lied to protect defendant during her initial statements. Because the jury was fully cognizant of Lucy's initial statement to Guzman that "with [defendant] present she changed [Kelly]'s diaper into a swimming diaper" prior to leaving for the pool, counsel's performance did not prejudice defendant under the second Strickland prong. We reach the same conclusion with respect to counsel's failure to cross-examine Guzman with the statements in his report that defendant and Lucy "gave the same recollection of the day."

Defendant further maintains that Lucy's testimony, in which she stated that she had "never dealt with [the Division] before," conflicted with evidence of a prior Division investigation in which she was involved, and thus trial counsel should have impeached her in order to "corroborate[] [defendant]'s testimony." Defendant certified before the PCR court that Lucy asked him to

22

tell the police "that [Lucy] was not in the room during the diaper change . . . because she was afraid of a second [Division] investigation." He also claimed that before his first trial, the court "concluded that there were [Division] reports of a previous incident, but they were not relevant to the issues in this case."

As the PCR court correctly determined, counsel's failure to impeach Lucy "did not have a damaging impact so as to overcome the strong presumption that trial counsel exhibited reasonable professional judgment in shaping trial strategy." Even assuming counsel was ineffective for failing to impeach Lucy on this point, defendant failed to establish that the trial outcome would have been different, particularly considering defendant's admission and the expert testimony, had counsel raised the prior Division involvement with Lucy and thus we agree with the PCR court that defendant failed to satisfy the prejudice prong of the Strickland test.

V.

Defendant further maintains that he received ineffective assistance because trial counsel did not cross examine Corcoran or Guzman regarding the destruction of their interview notes, as those notes "would have revealed that [defendant] told them [Lucy] was in the room during the diaper change." As a corollary to this argument defendant also claims that trial counsel was required

23

to request that the jury be "told that [Guzman and Corcoran] were required, under the discovery rules, to provide [defendant] with the pre-interview notes and that their destruction allowed [the jury] to draw an inference that the notes would have been favorable to the defense."  We disagree.

Initially, however, we note that the PCR court incorrectly concluded that defendant's argument regarding the adverse jury instruction was "procedurally barred" pursuant to Rule 3:22-5.  In defendant's direct appeal, it does not appear that defendant raised the issue of his trial counsel's failure to request an adverse jury inference.  See Katsigiannis, slip op. at 2-3.  Instead, the only jury charge issue raised by defendant on direct appeal was his argument that the trial court should have instructed the jury regarding lesser-included offenses.  Ibid.

"Under Rule 3:22-5, prior adjudication of an issue, including a decision on direct appeal, will ordinarily bar a subsequent post-conviction hearing on the same basis."  State v. Afanador, 151 N.J. 41, 51 (1997).  An issue is only barred under the Rule, however, if the issue sought to be precluded "'is identical or substantially equivalent' to the issue already adjudicated on the merits."  Ibid. (quoting State v. McQuaid, 147 N.J. 464, 484 (1997)).  Because "[i]neffective-assistance-of-counsel claims are particularly suited for post-conviction review," see State v. Preciose, 129 N.J. 451, 460 (1992), the mere fact that we previously

adjudicated the issue of lesser-included offenses on defendant's direct appeal does not procedurally bar defendant from alleging in a PCR petition that his trial counsel was ineffective for failing to request an adverse jury charge relating to the destruction of interview notes.

We conclude, however, that the record on appeal amply supports a determination that defendant failed to satisfy the Strickland test regarding counsel's failure to request an adverse jury instruction based on the alleged destruction of the detectives' interview notes. Defendant relies upon State v. W.B., 205 N.J. 588 (2011), to support his contention that an adverse jury instruction should have been issued based on Corcoran's and Guzman's failure to preserve their interview notes and turn them over to defendant. His reliance is misplaced.

In W.B., an investigator destroyed notes from her interviews of both the victim and the defendant after she incorporated them into her report. Id. at 607. Our Supreme Court concluded that such notes must be retained, holding that Rule 3:13-3, governing discovery and inspection, extended to "the writings of any police officer under the prosecutor's supervision." Id. at 607-08.

Critically, however, the W.B. court made clear that its holding would be prospective only, stating that "starting thirty days" following the W.B. decision,

"if notes of a law enforcement officer are lost or destroyed before trial, a defendant, upon request, may be entitled to an adverse inference charge molded, after conference with counsel, to the facts of the case." Id. at 608-09; see also State v. Dabas, 215 N.J. 114, 137-38 (2013) ("We clearly signaled that the note-retention requirement would apply prospectively to pre-indictment cases beginning after the thirty-day grace period in W.B.").

Defendant's interview took place on July 1, 2007, four years before W.B. took effect. After W.B., the State provided defendant's trial counsel with Guzman's notes from his interviews with Lucy and David. Because defendant's interview took place four years prior to W.B., without evidence or even an allegation that Guzman or Corcoran destroyed their interview notes after W.B., it was objectively reasonable for trial counsel not to cross-examine the detectives on the destruction of their notes at the second trial.

While defendant contends that "[h]ad counsel provided effective assistance, this issue would have been brought to the attention of the jury and the outcome would likely have been different," he offers no support for that conclusion. Even if trial counsel had successfully requested an adverse jury inference, as noted, the jury was already aware that Lucy told the police that she

26

was in the bedroom while defendant was changing Kelly's diaper and that she later testified she lied to protect defendant.

Further, the jury was aware that defendant's story changed between his initial statement to Guzman and his eventual confession later that day. Thus, because the jury already knew of the inconsistencies between Lucy's and defendant's oral statements to Guzman, their later written statements, and defendant's confession to the officers, any request by trial counsel for an adverse jury instruction regarding the officers' interview notes did not have a reasonable probability of changing the outcome. As such, defendant's argument fails the prejudice prong of Strickland.

VI.

Defendant next asserts that trial counsel improperly failed to object to the portion of Lucy's trial testimony in which she informed the jury that David told her, "[i]f [Kelly] was my kid I would make sure she was okay." Specifically, he avers that the statement was inadmissible hearsay pursuant to N.J.R.E. 801 and 802, and that it prejudiced defendant because "it suggested that [David] knew something about [defendant's] past with regard[] to child molestation . . . ."

Even assuming that David's statement did constitute inadmissible hearsay, we conclude that counsel's failure to object did not prejudice defendant in light

27                                                          A-3342-18T2

of the wealth of independent evidence indicating that defendant committed aggravated sexual assault, including his confession. By way of example, after an initial examination, Dr. Raguindin referred Kelly to Dr. Debellis, a child abuse specialist, based on the nature of her injuries and the lack of explanation by Lucy and defendant. In turn, Dr. Debellis offered expert testimony that "[a]cute penetrating trauma" caused Kelly's injuries and ruled out possible causes such as using a swing, going down a slide, or wiping the area. In addition, defendant admitted that he caused the injury when he confessed to Guzman, Corcoran, and Welsh that his "finger did go in by accident" while he was changing Kelly prior to going to the pool and "a little bit of blood came off [his] finger."

## VII.

Defendant next contends that Guzman "presented false testimony" because he testified that David refused to provide a formal statement, but at the first trial, the State cross-examined David and made various references to "when . . . Guzman and I met with you," "when we talked to you," and "[w]hen we spoke three weeks ago . . . ." Based on trial counsel's failure to cross-examine Guzman on whether David provided a previous statement to police, defendant maintains he received ineffective assistance at his second trial.

28

Contrary to defendant's assertion, Guzman did not present false testimony. Indeed, Guzman admitted that he spoke to David in person regarding the investigation in October 2011, but accurately stated that David did not "provide a formal statement." Thus, even if trial counsel read portions of David's cross-examination at the first trial to Guzman, it would not have functioned as proper impeachment because Guzman's testimony was not inconsistent with the prosecutor's inquiries about meeting with David. Defendant's trial counsel was therefore not ineffective in failing to cross-examine Guzman on David's failure to provide a formal statement. In any event, based on our review of the trial record, we cannot conclude that trial counsel's failure to cross-examine Guzman on that point prejudiced defendant.

## VIII.

We reach a similar conclusion with respect to defendant's claims that his appellate counsel was ineffective for failing to object to Guzman's testimony that none of the witnesses at the party or the pool provided statements to police because that "improperly shifted the burden of proof" to defendant to call those witnesses. Defendant maintains that had appellate counsel raised the issue on direct appeal, "[defendant's] conviction would have been reversed" because he was "stripped . . . of his presumption of innocence" and the jury was permitted

29

to infer from the non-production of those witnesses "that [their] testimony would have been unfavorable" to defendant.

A defendant is entitled to effective assistance of counsel at all stages of the proceedings, including on a first appeal as of right. State v. Morrison, 215 N.J. Super. 540, 545 (App. Div. 1987). The standard of review for ineffective assistance of appellate counsel claims is the same two-pronged test set forth in Strickland. See State v. Gaither, 396 N.J. Super. 508, 513-14 (App. Div. 2007). "'[I]n applying the Strickland standard to assess a claim of ineffective assistance of appellate counsel, defendant must show not only that his attorney's representation fell below an objective standard, but also that he was prejudiced, i.e., but for counsel's unprofessional errors, the result would have been different.'" Id. at 513 (quoting Morrison, 215 N.J. Super. at 546).

"[A]ppellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant." Morrison, 215 N.J. Super. at 549 (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); see also Gaither, 396 N.J. Super. at 516 (holding that appellate counsel is not "required to advance every claim insisted upon by a client on appeal"). In this regard, a criminal defendant's counsel is not ineffective by failing to raise a meritless legal argument on the defendant's behalf. State v. Worlock, 117 N.J. 596, 625 (1990).

A criminal defendant is presumed innocent until proven guilty beyond a reasonable doubt. State v. Hill, 199 N.J. 545, 558-59 (2009). An adverse inference charge, however, is not "invariably available whenever a party does not call a witness who has knowledge of relevant facts." Washington v. Perez, 430 N.J. Super. 121, 128 (App. Div. 2013) (quoting Hill, 199 N.J. at 561). Where the witness's testimony is unimportant, cumulative, or inferior to testimony already presented on the issue, it is reasonable to infer that non-production is explained by the fact that the testimony is unnecessary. State v. Velasquez, 391 N.J. Super. 291, 308-09 (App. Div. 2007) (citing State v. Clawans, 38 N.J. 162, 171 (1962)).

Here, defendant's presumption of innocence was not undermined by Guzman's testimony that none of the other guests at the barbeque "ha[d] gotten back to [him]." Instead, as the State correctly argues, "the prosecutor merely established that Guzman investigated the matter fully and completely, an issue that trial counsel ultimately focused on during cross-examination."

Further, the record, including testimony from defendant himself, established that the other guests at the barbeque would have provided testimony that was "unimportant, cumulative, or inferior to testimony already presented," see Velasquez, 391 N.J. Super. at 308, as the only witnesses with personal

31

knowledge as to whether defendant committed first-degree sexual assault were defendant, Lucy, and David. Moreover, even if the jury could have inferred that those witnesses' testimonies would have been unfavorable to defendant, the court reaffirmed defendant's presumption of innocence with the following jury instruction:

> [Defendant] is presumed to be innocent, and unless each and every element of the offense of aggravated sexual assault . . . is proven beyond a reasonable doubt[,] [defendant] must be found not guilty of that charge. And the burden of proving each and every element of the charge beyond a reasonable doubt rests upon the shoulders of . . . the State, and that burden never shifts to [defendant]. . . . [Defendant] has no obligation or duty to prove his innocence, or offer any proof relating to his innocence.

Thus, appellate counsel was not ineffective for failing to object to Guzman's testimony because it did not shift the burden to defendant to call those witnesses.

IX.

We also reject defendant's ineffective assistance claim regarding appellate counsel's failure to raise the issue that defendant's confession to the officers should have been excluded at trial due to an "unlawful Fourth Amendment seizure" that allegedly occurred when the officers searched his home hours earlier.

32

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by requiring warrants issued on probable cause. "Under our constitutional jurisprudence, when it is practicable to do so, the police are generally required to secure a warrant before conducting a search . . . ." State v. Hathaway, 222 N.J. 453, 468 (2015) (citations omitted).

In New Jersey and federal courts, "[t]he exclusionary rule will not apply when the connection between the unconstitutional police action and the secured evidence becomes so attenuated as to dissipate the taint from the unlawful conduct." State v. Shaw, 213 N.J. 398, 414 (2012) (internal quotation marks omitted). "In making that determination, the test is not whether the authorities would have failed to obtain the challenged evidence 'but for' their illegal conduct." Johnson, 118 N.J. at 653. Rather, "[t]he test followed by both federal and New Jersey courts is based on three factors: (1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." Ibid. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). Applying those three factors, we have held that evidence seized after a

defendant's voluntary consent to search should not be excluded if the consent was "'sufficiently an act of free will to purge the primary taint.'" State v. Chapman, 332 N.J. Super. 452, 468 (App. Div. 2000) (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)).

Relying on the Brown factors, defendant claims that had appellate counsel raised the Fourth Amendment argument on direct appeal, we would have determined that there was "an unbroken causal connection between his seizure and confession," that his confession should have been suppressed, and that his conviction would have been reversed. We disagree.

Importantly, in our opinion affirming defendant's conviction, we "part[ed] company with the suppression judge" in that we concluded defendant was in custody "for purposes of self-incrimination analysis" at the time the police searched his home. Katsigiannis, slip op. at 27-28. We made no comment as to whether defendant was illegally seized in violation of the Fourth Amendment.

As the State correctly argues, even if defendant was seized for Fourth Amendment purposes at the time the police searched his residence, he consented to the subsequent search. The State bears the burden to establish knowing and voluntary consent; in other words, "that the individual giving consent knew that he or she had a choice in the matter." State v. Hagans, 233 N.J. 30, 39 (2018)

34

(quoting State v. Carty, 170 N.J. 632, 639 (2002)). "The lynchpin to voluntary consent 'is whether a person has knowingly waived [his or her] right to refuse to consent to the search.'" Ibid. (quoting State v. Domicz, 188 N.J. 285, 308 (2006)).

Here, defendant signed a consent-to-search form permitting the officers to "conduct [a] complete search of the property and premises located at [defendant's address]." That form also stated that he provided "consent to search freely and voluntarily without fear, threat, coercion, or promises of any kind," and that he knowingly waived his right to refuse consent. Further, he showed the officers the location of Kelly's bloody diaper and the baby wipes used by Lucy and defendant to attempt to clean Kelly's wound.

And, even assuming defendant's consent to search the home did not render any Fourth Amendment seizure lawful, the State correctly asserts that his confession to the police nearly nine hours later was sufficiently attenuated as to render that confession admissible. Where the connection between the unlawful police conduct and the seizure of evidence is "so attenuated as to dissipate the taint" from the unlawful conduct, the evidence need not be excluded. Brown, 422 U.S. at 609 (1975); see also State v. Badessa, 185 N.J. 303, 311 (2005).

Applying the Brown factors, between eight and nine hours elapsed between the search of defendant's home and his confession at the police station. Any unreasonable police seizure at his home nine hours earlier did not influence defendant's confession. As such, the temporal proximity factor weighs in favor of the State.

Regarding the second prong, defendant's written statement at the police station functions as an intervening event sufficient to purge the taint of any illegal seizure. It was only after that statement, during a verbal recorded interview with Guzman, Corcoran, and Welsh that defendant admitted that his "finger did go in on accident" and that "a little bit of blood came off [his] finger."

Finally, any alleged police misconduct in searching defendant's home was not flagrant. Defendant signed a consent form permitting the police to search his home and directed the police to the location of the trash can containing diapers while inside the home. The record does not indicate that defendant's consent was coerced or that the police engaged in any other misconduct while searching defendant's home. Based on the Brown factors, any illegal seizure of defendant by the police was sufficiently attenuated from his confession.

In this regard, as noted, counsel has no obligation to put forth a meritless argument. See Worlock, 117 N.J. at 625. As defendant's confession at the police

station after having written a nonconforming statement was sufficiently attenuated from any alleged Fourth Amendment seizure that occurred during the consent search of his home, defendant's claim was meritless. Thus, appellate counsel was not ineffective for failing to argue on defendant's direct appeal that defendant's confession should have been suppressed based on a Fourth Amendment violation.

## X.

Last, we note that defendant's claim that he was entitled to an evidentiary hearing is without merit. Hearings in such cases are discretionary. R. 3:22-10. Trial courts should grant evidentiary hearings only if the defendant has presented a prima facie claim of ineffective assistance, material issues of disputed fact lie outside the record, and resolution of the issues necessitate a hearing. R. 3:22-10(b); Porter, 216 N.J. at 355. That was not the case here. Judge Kazlau correctly concluded that defendant failed to establish a prima facie case of ineffective assistance of counsel. Therefore, we find that Judge Kazlau did not abuse his discretion in denying defendant's request for a hearing.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3342-18T2